[Crim. No. 3085. First Dist. Div. One. Feb. 16, 1956.]

THE PEOPLE Respondent, v. JOE MORA et al., Appellants.

Joe Mora, Michael Gallardo and William R. Inocencio, in pro. per., and George W. Kilbourne and Carl B. Shapiro, under appointment by the District Court of Appeal, for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

PETERS, P. J.—The three defendants, Mora, Gallardo and Inocencio, were charged with having robbed Allan Tompkins and Margaret Von Husen on April 8, 1954, of five guns and $160 in cash. Each defendant was also charged with a prior felony conviction. The defendants admitted the priors but pleaded not guilty to the robbery. The jury found all three guilty of first degree robbery. From the judgments

based on these verdicts, and from the orders denying their motions for new trials, all three defendants appeal.

Upon request of the defendants, counsel were appointed to represent them. To prevent possibility of a conflict of interests one lawyer was appointed to represent Mora, while another lawyer was appointed to represent Gallardo and Inocencio. Both lawyers have ably performed their assigned tasks.

The robbery involved occurred about 1:20 p. m., April 8, 1954, and was of a sporting goods shop in Oakland where Allan Tompkins and Margaret Von Husen were employed. The robbers took five guns and about $160 in cash. Tompkins identified Mora as one of the robbers, while Von Husen identified Inocencio as another of the robbers. Neither could identify Gallardo as a participant, his conviction being based on other evidence.

The three defendants, according to their own testimony, were together during most of April 8, 1954, and, while denying complicity in the crime, admitted being together at 1:20 p. m., the time of the robbery.

The proprietor of Tex and Mae's in Oakland, a restaurant and bar, testified that the three defendants, together with two other men, entered the tavern at 10 a. m. on April 8th, and four of them, including the three defendants, left the premises about 11 a. m. The four returned to the tavern about 2 p. m., stayed a short time, and left.

Tompkins, an employee of the sporting goods shop, testified that about 1:20 p. m. Mora entered the store, and, after some preliminary conversation, pulled a gun and ordered Tompkins to face the wall. While Tompkins was talking to Mora two other men came into the shop, one going to the back of the store, the other going to the gun rack where he removed two shotguns and three small guns, including a pellet gun. One of the shotguns belonged to one Gooch by name, who had left the gun at the store. The robber who came to the back of the store, identified by Miss Von Husen as Inocencio, ordered her to open the cash drawer, which she did, whereupon he removed the money therein contained, about $160. The two employees were then, at gunpoint, forced into a back room, and the three robbers fled.

An operator of a nearby store saw three or four men carrying guns pass in front of her store about 1:30 p. m. of April 8, 1954. One of them she identified as Inocencio. Other witnesses identified the car used by the robbers, a grey 1937

two-door sedan. Such a car was owned by an uncle of Inocencio, who testified that on April 8, 1954, he had parked the car near where he works, that at lunch time he noted that someone had taken the car which could easily be started without an ignition key, but that at 4:30 p. m. he returned to the area where had had parked the car and found Inocencio, somewhat intoxicated, sitting in it.

Another prosecution witness, Zambrano by name, who was an old friend of Inocencio's and Mora's, testified that early in the evening of April 10, 1954, Inocencio and Gallardo, whom the witness had not theretofore known, in the company of a third man, Rodriguez by name, came to his home. Gallardo brought into the house two shotguns, one of them the gun owned and identified by Gooch, and several small guns, including a pellet gun. They were the guns stolen from the sporting goods shop.

All three defendants took the stand and told substantially the same story. They admitted being together on April 8, 1954, for most of the day and particularly at 1:20 p. m. Gallardo testified that he was at Tex and Mae's, in the company of defendants, until nearly noon of April 8, 1954; that he then left that tavern with the other two defendants and another man in a Chevrolet of the make, type and color of the one owned by Inocencio's uncle; that they then went to Roy's Bar; that while there the fourth man, Tony Rodriguez, was given a traffic ticket for jaywalking. The bartender at Roy's and the officer who had issued the citation verified this testimony. The officer stated that the citation was issued at 12:48 p. m. Gallardo testified that he did not leave Roy's place until 2 p. m. when the four left; that he then spent several hours at home, and then returned to Tex and Mae's where he met the other two defendants and Rodriguez; that the evening of the 8th the four made the rounds of several bars, and about midnight Rodriguez and a man by the name of Real told him that Real had some guns to sell which Gallardo wanted to buy for purposes of resale; that pursuant to an agreement then made, he met Real on the 9th, and purchased from him the two shotguns and the small guns for $500; that on the evening of the 9th he, Rodriguez and Inocencio went to Richmond to spend the night; that they did this because Inocencio had some traffic tickets and they had learned that some officers had called at Inocencio's home and believed it was in connection with these traffic tickets or possible parole violations; that they returned from Rich-

mond on the 10th and tried to sell Zambrano the guns in order to raise money to pay Inocencio's traffic tags. Gallardo admitted on the stand that when arrested on April 12th he had told the officers he had secured the guns from Inocencio, but that this was untrue. He told the investigating officers that he first saw the guns in the 1937 Chevrolet in the late afternoon of April 8th, but on the trial stated he first saw the guns on April 9th.

Mora told substantially the same story as did Gallardo, and specifically stated that the three defendants and Rodriguez remained in Roy's Bar for at least 40 minutes after Rodriguez got the jaywalking citation.

Inocencio told substantially the same story. He admitted picking up his uncle's Chevrolet before noon of April 8th and going with the other defendants and Rodriguez to Roy's, where they arrived at about quarter to one. He first testified that they left Roy's about half an hour after Rodriguez got the traffic tag, but on cross-examination fixed the time they left Roy's at 2 p. m. He testified that he first saw the guns on the 10th when Gallardo showed them to Zambrano.

A patron of Roy's Bar testified that he saw the three defendants and Rodriguez in the bar, when Rodriguez got the traffic tag, and that they all remained there for 30 or 40 minutes thereafter. The bartender at Roy's fixed the time the people with Rodriguez remained in the bar after Rodriguez got the traffic tag at 10, 15 or 20 minutes, but "they might have stayed more for all I know."

All of the appellants attack the sufficiency of the evidence, contending that there was no substantial evidence to connect them with the crime. ■ In addition to the more than ample circumstantial evidence, Mora was clearly and unequivocally identified by Tompkins, and Inocencio was similarly identified by Von Husen. It is true that there is no direct identification of Gallardo as one of the robbers, but the circumstantial evidence connecting him with the crime is substantial and sufficient. Admittedly, he had possession of the guns one or two days after they were stolen. Admittedly, he told inconsistent stories as to how the guns had come into his possession. He admitted to being with Mora and Inocencio, who were identified, between 1 and 2 p. m. on April 8th, when the robbery was committed.

The law is clear that such evidence is sufficient to sustain the judgment against this appellant. ■ ". . . when a person is shown to be in possession of recently stolen property

slight corroborative evidence of other inculpatory circumstances tending to show guilt is sufficient to support a conviction." (*People* v. *Bonner*, 5 Cal.App.2d 623, 631 [43 P.2d 343], citing several cases.) ■ ". . . among the circumstances which in addition to the fact of possession of the stolen property are held sufficient to connect the accused with the crime and to sustain his conviction, are false statements showing consciousness of guilt, or as to how the property came into his possession." (*People* v. *Russell*, 34 Cal.App.2d 665, 669 [94 P.2d 400].)

■ The appellants also urge that the prosecuting attorney was guilty of prejudicial misconduct in several respects. Most of these assignments of error are of minor importance. For example, it is contended that the prosecutor improperly asked leading questions of prosecution witnesses on many occasions. An examination of the reporter's transcript shows that appellants seldom objected to such questions and, in the few cases that they did, the objections were almost invariably sustained. This being so, the point cannot be raised on appeal. (*People* v. *Russo*, 133 Cal.App. 468 [24 P.2d 580].) Moreover, under section 2046 of the Code of Civil Procedure, discretion is conferred on the trial court to allow such questions. ■ The proper rule is stated in *People* v. *Mason*, 86 Cal.App.2d 445, 456 [195 P.2d 60], as follows: "Not only is it proper to ask leading questions when they are designed more quickly to reach the testimony material to the issues [citing a case], but the trial court has a wide discretion in determining the extent to which such questions may be asked. [Citing a case.] ■ In defining the term 'leading question' (Code Civ. Proc., § 2046) as one 'which suggests to the witness the answer which the examining party desires' the Legislature contemplated only answers material to the issue under consideration. ■ For the orderly expedition of a trial it is proper by leading questions for the examiner to place the circumstances of the witness before the court." (See also *People* v. *Goff*, 100 Cal.App.2d 166 [223 P.2d 27]; *People* v. *Hamilton*, 69 Cal.App. 127 [230 P. 974]; *People* v. *Garbutt*, 197 Cal. 200 [239 P. 1080].) There was no abuse of discretion in the instant case.

■ Objection is also made to the fact that in his closing argument the prosecuting attorney on several occasions referred to the stories told by appellants as "lies" and characterized the appellants as "liars." This was fair comment. When a witness tells one story when arrested and another

story on the trial, one of the stories is untrue, i.e., is a lie, and the person who tells such conflicting stories can properly be characterized as a "liar." All of the appellants told different stories at different times. Thus, the prosecutor's statements, although harsh, were in the realm of fair comment. It should also be noted that at the trial no objection was made to these statements.

■ The prosecutor was guilty of misconduct in stating to the jury, during argument: "We have accused all three men of the crime and I am firmly convinced they committed it." Such argument necessarily implies that the prosecutor has knowledge of facts not presented to the jury that convinces him of the guilt of the appellants. This type of argument has frequently been condemned by the courts. (*People v. Adams*, 92 Cal.App. 6 [267 P. 906]; *People v. Podwys*, 6 Cal.App.2d 71 [44 P.2d 377]; *People v. Edgar*, 34 Cal. App. 459 [167 P. 891]; *People v. Hidalgo*, 78 Cal.App.2d 926 [179 P.2d 102]; *People v. Kirkes*, 39 Cal.2d 719 [249 P.2d 1]; *People v. Teixeira*, 136 Cal.App.2d 136 [288 P.2d 535]; *People v. Bell*, 138 Cal.App.2d 7 [291 P.2d 150].) But, although this was error, it was not necessarily prejudicial. Each case under article VI, section 4½ of the Constitution, must be determined on its own facts. The fact that appellants did not assign the remarks as misconduct when they were made is entitled to some weight. The evidence of guilt is quite conclusive. Under such circumstances we do not believe that the error was prejudicial. (*People v. Teixeira*, 136 Cal.App.2d 136 [288 P.2d 535].)

Appellants next contend that by the use of leading questions certain witnesses were "led" into identifying certain of the appellants. The record does not bear out these contentions. But appellants claim that they were deprived of due process because the identifications were induced by the police by the use of what they call applied psychology. There is no support for this contention. So far as the record shows, the witnesses exercised their own judgment in making the identifications, and, where they were doubtful, they were careful to so state. ■ The use of the police line-up and the use of photographs are proper methods to ascertain identity. Never, to our knowledge, have such methods, when used fairly, been disapproved by an appellate court.

One of the appellants charges that it was error for the trial court to have failed to give an instruction on what is claimed to be the included but lesser offense of receiving

stolen property. Of course, it is the duty of the trial court, under section 1159 of the Penal Code, to instruct the jury on any included offense on which there is evidence. (*People* v. *Brown,* 131 Cal.App.2d 643 [281 P.2d 319].) Here there was evidence of the receipt of stolen goods. But that offense is not included in the offense of robbery. The elements of the two offenses are different. (See *People* v. *Russell,* 34 Cal.App.2d 665 [94 P.2d 400], holding that receipt of stolen property is not included in offense of burglary, and *In re Stanley,* 90 Cal.App. 132 [265 P. 561], holding that it is not included in grand theft.)

 Appellants object to an instruction substantially in the language of section 1127c of the Penal Code to the effect that an inference of guilt arises from flight. It is contended there was no substantial evidence of flight, and that the instruction, if given, should have been more extensive. As to the last contention, the code section involved expressly provides "No further instruction on the subject of flight need be given." So far as the contention that there was no substantial evidence of flight is concerned, the contention is contrary to the record. The appellants Inocencio and Gallardo testified that on April 9th, the day after the robbery, they failed to return to their homes in Oakland but went to Richmond to spend the night after learning that police officers had been inquiring about one of them. Certainly the jury did not have to believe the explanation given by them for thus leaving their homes.

 It is true that there was no evidence of flight insofar as appellant Mora is concerned. The instruction should have been limited to the other two appellants. It is equally true that the prosecutor stated in his closing arguments that all three appellants went to Richmond. But no admonition was asked at the time. Mora was positively identified by Tompkins. The evidence against him is overwhelming. This being so, the error was not prejudicial.

The other contentions of appellants are so obviously lacking in merit that discussion of them is not required.

The judgments and orders appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.