[Crim. No. 3151. First Dist., Div. One. May 22, 1956.]

THE PEOPLE, Respondent, v. GEORGE
GREGOR, Appellant.

George Gregor, in pro. per., and MacInnis, Alaga & Glassman for Appellant.

Edmund G. Brown, Attorney General, and William M. Bennett, Deputy Attorney General, for Respondent.

PETERS, P. J.—The defendant was charged with two counts of burglary, and with a prior robbery, for which he had served time. He admitted the prior, but pleaded not guilty to the two main charges. He was convicted by a jury of both counts contained in the information. He appeals from the judgment of conviction and from the order denying his motion for a new trial.

One of the charges involved the burglary of a radio store at 1282 Market Street. Sometime between 6 p. m. on Saturday, November 6, 1954, and 9 a. m. on Monday, November 8th, that store was broken into by means of a hole cut in the ceiling of the store from a hotel room above. Two Hallicrafter radios, a Zenith portable radio whose serial number was known, and several other radios were missing. The safe had been broken into, the combination lock broken off, and the tumblers punched out. Some $1,551 was taken from the safe, consisting of checks, cash and coins, some of the coins being wrapped. A pink slip to a Cadillac owned by the owner of the store was also missing.

The second charge involved the burglary of a service station at 1200 Clayton Street, which was burglarized during the night of December 1, 1954. Entry here had been secured by cutting a hole by torch through a steel wall from one of the restrooms of the establishment, into the lubrication room, which, in turn, led into the office. Here, too, the safe had been broken into, its dial knocked off and the tumblers punched out. Money and checks were taken from the safe.

Evidence of another burglary, not charged, also appears in the evidence. The Peninsula Distributing Company in San Mateo was burglarized during the night of September 11, 1954, entry being secured through a skylight. Here, too, the safe had been pried open. A checkwriting machine, 58 blank checks, and two petty cash boxes were taken.

The pertinent testimony at the trial can be summarized as follows: An inspector of the police robbery detail testified that he arrested defendant on December 20, 1954, under the

following circumstances: On that date, he called upon defendant in his apartment located at 795 Corbett Avenue, San Francisco. Defendant was then alone in the apartment. The officer identified himself and told defendant that he wanted to question him about a missing automobile license plate. Defendant denied knowledge of the plate, but invited the officer to enter. The officer searched the premises. In a closet off the living room the missing license plate was found, as well as burning torches, acetylene tanks, and a white canvas sack containing seven of the checks taken from the service station. Nearby was a brown metal suitcase containing coins. In another money bag were found several rolls of coins similar to those taken from the radio store, and, on the kitchen table, was found the Zenith radio taken in that burglary. A Hallicrafter radio of the type stolen from the radio store was found in the living room. The checkwriting machine stolen from the Peninsula Distributing Company was also found in the closet. On the floor of the closet were found two walkietalkies, batteries, bolt cutters, a wire ladder, a sweat shirt, gloves, gauges, a sledgehammer, a punch bar, and wire and rope.

The defendant admitted to the officer that the apartment was his, but at first denied any knowledge of who owned the items above mentioned. Upon further questioning, he at first remained mute, but then stated: "Well, they are in my possession, I guess they must be mine." He also admitted renting the apartment under an assumed name.

There was evidence from another police officer that the equipment and tools found in the apartment were capable of effecting entry to the radio store and service station, were capable of punching out the safes there located, and were commonly used by burglars in breaking, or entering, or leaving the premises.

One of defendant's defenses was based on evidence that at the time of the burglaries he had a broken back, was encased in a large body cast, and could not have done the physical work involved in the burglaries. A doctor testified that on September 27, 1954, 40 days before the radio store burglary, and 64 days before the service station burglary, he had examined defendant, who gave a false name, and discovered that defendant had a fractured vertebra in his spine. Defendant was taken to a hospital where he remained until October 6, 1954. As part of the prescribed treatment defendant was encased in a large body cast which he was still wearing

on December 20, 1954, when he was arrested, and which was not removed until January 12, 1955.

The specialist who treated defendant testified that the injury suffered by defendant was very painful and made heavy work difficult and painful. Defendant, however, after the cast was put on, was ambulatory, and, at the time of the burglaries, could drive a car, and could, of course, operate a walkie-talkie telephone.

The defendant testified that upon leaving the hospital on October 6, 1954, he went to live with a Mr. and Mrs. Decota in South San Francisco; that he had only been at his apartment, where he was arrested, twice between August and December, 1954, and that he moved back to his apartment on December 20, 1954, at 1 or 2 a. m. Several witnesses corroborated defendant to the extent that they testified that during November and early December, 1954, they had seen defendant at the home of the Decotas, where he was obviously then living. At least one of these witnesses testified that by early December defendant was able to drive a car. Neither Mr. nor Mrs. Decota was called to testify.

Defendant explained his use of false names by testifying that he was trying, in this fashion, to break off associations with persons he had met in San Quentin. He also testified that for part of the time he was living in South San Francisco he had sublet the apartment to a girl named "Lois," and that in October, 1954, he had given access to the apartment to a former prison friend by the name of Cornuelle, sometimes referred to as Cornell. Defendant denied knowing that the stolen goods or the burglar's tools were in his apartment, denied ever seeing them before, claimed that the Zenith radio was in the closet and not in the kitchen, but admitted that the Hallicrafter radio was in the living room, denied admitting that the property belonged to him, and, in general, denied any connection with the burglaries. He admitted to having paid the rent on the apartment ($125 a month) since 1951, and admitted that he was purchasing a Cadillac. He had not worked for a year prior to his arrest, claiming to have earned enough to live by gambling.

Cornuelle, at the time of trial an inmate of San Quentin, testified that he had lived in the defendant's apartment from October to late December, 1954, that the burglary equipment and stolen articles were his, and that defendant knew nothing about these articles; that the Hallicrafter radio found in the

apartment had been placed there by someone identified only as "Ray." Admittedly, from October through December, Cornuelle was a registered guest in a San Francisco hotel.

The appellant first attacks the sufficiency of the evidence by claiming that the only evidence against him is that he was found in possession of recently stolen property, and by urging that such evidence is not sufficient to sustain a conviction. A few quotations will suffice to point out the rule in this regard:

In *People* v. *Mora,* 139 Cal.App.2d 266, 271, 272 [293 P.2d 522], this court stated: ". . . when a person is shown to be in possession of recently stolen property slight corroborative evidence of other inculpatory circumstances tending to show guilt is sufficient to support a conviction."

In *People* v. *Taylor,* 4 Cal.App.2d 214, 217 [40 P.2d 870], the applicable rules are summarized as follows: "The failure of the accused to account for such possession upon a theory inconsistent with his guilt of the offense charged, or to show that the possession was honestly obtained, is itself a circumstance tending to show guilt. This corroborating evidence need be but slight, provided it is convincing. Flight, false statements showing consciousness of guilt or as to how the property came into defendant's possession, assuming a false name, inability to find the person from whom defendant claimed to have received the property, have each in turn been held to be sufficient to connect the accused with the crime when proven in connection with possession of the stolen property. [Citing two cases.] And when defendant makes an explanation as to the manner in which he came into possession of such stolen property, the question as to whether he is telling the truth in that regard rests solely with the jury." (See also *People* v. *Smith,* 128 Cal.App.2d 706 [275 P.2d 919]; *People* v. *Nelson,* 126 Cal.App.2d 453 [272 P.2d 536]; *People* v. *Clark,* 122 Cal.App.2d 342 [265 P.2d 43]; *People* v. *Russell,* 34 Cal.App.2d 665 [94 P.2d 400]; *People* v. *Bonner,* 5 Cal.App.2d 623 [43 P.2d 343]; *People* v. *McClain,* 115 Cal.App. 505 and 512 [1 P.2d 1085].)

How do these rules apply to the present case? Obviously, appellant was found in possession of recently stolen property. Now what corroborative evidence was there to support the finding of the jury that appellant had stolen this property? First, along with the stolen property was found an assortment of burglar's tools of the type that could have been used in the two charged burglaries. According

to the arresting officer, defendant admitted that these things, and the stolen property, were his. Then it was shown that appellant rented the apartment under a false name and likewise gave the doctor a false name. Appellant's explanation to the effect that in this fashion he was trying to dissolve associations with former convicts seems questionable when it is remembered that appellant testified that he let Cornuelle, an ex-convict, use the apartment without charge, and when the evidence shows that during the period involved appellant was closely associated with a Ralph Hill, another San Quentin acquaintance. Another corroborating detail is that several inconsistencies appear in appellant's evidence. In one place in the record appellant testified that he returned to the apartment at 1 a. m., the day of his arrest, while in another place he testified that it was 9 p. m. of the night before his arrest. Appellant testified that he had sublet the apartment to "Lois" who, he said, had paid at least one month's rent to the realty company. This was denied by officers of the realty company who testified that appellant alone paid the rent. Appellant and Cornuelle differed by over two months as to when "Lois" is supposed to have occupied the apartment. It should also be mentioned that the record shows that appellant traveled to Las Vegas when one Stelling was sentenced for violation of the Dyer Act involving the Cadillac whose pink slip had been stolen from the radio store, the car itself being stolen several days later. These corroborating details, and others that could be mentioned, constitute substantial corroborating evidence, which, when considered with the possession of the stolen goods and of the burglary tools, point to appellant as one of the participants in the burglaries.

■ Appellant next objects to the admission into evidence of the facts in reference to the Peninsula Distributing Company burglary, and of the checkwriting machine that had been stolen in that burglary and found in appellant's apartment. Of course, evidence of other crimes is admissible to show a common pattern, plan or scheme, or where such evidence helps to show motive, intent, premeditation, guilty knowledge or malice. (*People* v. *Cassandras*, 83 Cal.App.2d 272 [188 P.2d 546]; *People* v. *Albertson*, 23 Cal.2d 550 [145 P.2d 7]; *People* v. *Dabb*, 32 Cal.2d 491 [197 P.2d 1]; *People* v. *Newson*, 37 Cal.2d 34 [230 P.2d 618].)

In the instant case the challenged evidence was offered to show criminal intent and common plan. The jury was instructed, at the request of the prosecutor, that the evidence

was offered for those limited purposes. It was clearly admissible to show intent and common plan. Obviously, where the loot from three recent burglaries is found in a defendant's possession, that tends to show guilty knowledge. In all three burglaries the *modus operandi* was similar.

It should also be mentioned that when the evidence of the Peninsula Distributing Company burglary was first offered by the prosecution, appellant offered no objection. No objection was made until the stolen checkwriting machine was offered into evidence. ■ Generally speaking, failure to object amounts to a waiver. (*People* v. *King,* 13 Cal.2d 521 [90 P.2d 291]; *People* v. *Whalen,* 70 Cal.App.2d 142 [160 P.2d 560]; *People* v. *Odom,* 72 Cal.App.2d 72 [164 P.2d 68]; *People* v. *Hurst,* 36 Cal.App.2d 63 [96 P.2d 1003]; *People* v. *Descant,* 51 Cal.App.2d 343 [124 P.2d 864].)

Appellant next charges the prosecutor with seven acts of prejudicial misconduct.

1. Again appellant urges that evidence of the Peninsula Distributing Company burglary was inadmissible and that to offer it was prejudicial misconduct. As already held, the evidence was admissible.

■ 2. Next objection is made that the prosecutor was guilty of prejudicial misconduct during his redirect examination of the arresting officer when he was queried about the "walkie-talkie bank robbers." This occurred under the following circumstances: The arresting officer on direct told of finding the walkie-talkie in appellant's apartment. On cross-examination appellant's counsel then asked the officer if, at the time of the burglaries here involved, the police were also looking for some walkie-talkie bandits who had robbed a Bank of America branch on Geary Street. The officer replied, "Yes." Then the officer was asked if appellant had not been exonerated of that charge, to which he replied, "No," that no charge had been filed, but the investigation was still open. Then on redirect occurred the incident of which complaint is made. The prosecutor asked the arresting officer if the bank investigation was still open, and if the bank robbers were masked. The officer replied, "Yes." Then he was asked if those robbers used a walkie-talkie, to which he replied that they did use one very similar to the one in evidence. Obviously, this redirect examination was proper. Appellant's counsel opened the subject, apparently in an attempt to raise the inference that appellant was free from complicity in the bank crime that had been widely

publicized. The prosecution had the right to try to rebut that inference. (Code Civ. Proc., § 2048.)

3. After the walkie-talkies had been introduced into evidence another officer testified that these machines were sometimes used by burglars for communication between the inside operator and the lookout. On the objection of appellant that this was speculative, this evidence was stricken. In its instructions the trial court told the jury to disregard all evidence that had been stricken. Certainly this is not a situation where the mere asking of the question was prejudicial. Simply because an objection is sustained to a question does not mean that the mere asking of it constitutes prejudicial error.

4. Objection is next made to the cross-examination of one of appellant's medical witnesses who was asked if appellant's back injury could have been caused by a fall from a building or down a light well. The obvious purpose of the question was to raise the inference that appellant fell while engaged in another burglary of which there was no evidence. Thus, the question was clearly improper, and the trial court so ruled by properly sustaining an objection to it. Thus, there was no prejudice.

5. An improper question was also asked appellant on cross-examination when he was asked concerning the circumstances in reference to his prior conviction. This occurred under the following circumstances: The prosecutor asked appellant if he knew Cornuelle, and when appellant replied that he did, asked if Cornuelle was an ex-convict, appellant replied: "In fact, in 1945, me and Arthur Cornuelle went to the penitentiary on the same offense there; we both pled guilty to armed robbery." The prosecutor then asked: "You broke into Grison's Restaurant together, and burglarized the restaurant and also held up the——." Appellant's counsel here objected, and, after some argument, the trial court sustained the objection. The question was improper because it attempted, improperly, to go into the background of the prior, and also implied that appellant was guilty of burglary as well as armed robbery. But the trial court properly sustained the objection. We cannot hold that the mere asking of the question was prejudicial misconduct.

6. The sixth assignment of misconduct relates to evidence concerning the stolen license plate found in appellant's possession, and the automobile from which it came. It will be remembered that the arresting officer testified that when

he called at appellant's apartment he asked about the stolen license plate which had been stolen from a Cadillac, and later discovered the plate in appellant's apartment. It was introduced into evidence along with the other stolen goods found there. On cross-examination of appellant the prosecutor elicited from him that the license plate was "hot," that it came from a Cadillac stolen in Oakland, and that the companion plate had been found on an automobile belonging to Ralph Hill, and that the stolen Cadillac had been parked near to appellant's apartment. Appellant denied all knowledge of the stolen Cadillac or of its license plates. Appellant's counsel then objected to this line of questioning, assigned it as misconduct, and moved for a mistrial. The court denied the motion and the subject was dropped until the arresting officer was recalled in rebuttal. He testified that the police, when they left appellant's apartment with appellant under arrest, discovered the stolen Cadillac parked in front of 715 Corbett Street, appellant's apartment being 795 Corbett Street. Then there were a whole series of questions relating to the license plate and the stolen Cadillac. Objections to many of the questions were sustained on the ground that appellant's knowledge was hearsay. The questions not based on hearsay were not objected to. Clearly, proper evidence of this other offense was admissible to show guilty knowledge or intent on the part of appellant in whose apartment the stolen plate was found.

7. The last assignment relates to evidence relating to the arrest of appellant in Las Vegas while in the company of Ralph Hill. It will be remembered that in the burglary of the radio store an ownership slip to a Cadillac was stolen. The Cadillac belonged to the owner of the radio store, and it was stolen several days after the radio store burglary. This is a different Cadillac from the one found near appellant's apartment. It appears that a person by the name of Stelling was charged in Nevada with a violation of the Dyer Act in connection with this Cadillac. Appellant admitted knowing Stelling, "vaguely." He was then asked if, in company with Ralph Hill, he had not gone to Las Vegas to attend Stelling's trial. Appellant replied that he had gone to Las Vegas with Hill, not for the trial, but for Stelling's sentencing, because Hill, not appellant, was interested in Stelling. Hill testified that appellant accompanied him to Las Vegas to help with the driving, and to gamble, while the witness went to see Stelling. No objection

is made to any of this examination. The alleged misconduct occurred during the cross-examination of Hill when he was asked: "Isn't it a fact that you and Gregor got arrested in Las Vegas as you left the courthouse?" Appellant vigorously objected, cited the asking of the question as misconduct, and moved for a mistrial. The court denied the objection and the motion, ruling that the question was proper. Hill then was forced to admit that he and appellant had been so arrested. The ruling was proper. Hill had testified on direct that appellant had gone to Las Vegas to help the witness by doing some of the driving, and to gamble, and not to attend Stelling's trial. The prosecutor was entitled to rebut that by showing that appellant had in fact attended the trial.

We have reviewed all seven charges of misconduct. Undoubtedly there were several questions asked by the prosecutor that should not have been asked, and that he should have known were objectionable. But after reading the entire record we cannot say that such conduct was prejudicial. Certainly we cannot say that "a different verdict would not have been improbable had the error not occurred." (*People* v. *Teixeira*, 136 Cal.App.2d 136, 151 [288 P.2d 535].)

Appellant next objects to several instructions which he concedes correctly state the law but which he contends find no support in the record. He contends that this was error, under the well settled rule that a jury should not be instructed on points not supported by the record. (*People* v. *Moore*, 43 Cal.2d 517 [275 P.2d 485]; *People* v. *Silver*, 16 Cal.2d 714 [108 P.2d 4].)

Appellant first objects to instructions correctly setting forth the law as to the liability of principals. A principal is, of course, one who commits the charged offense or who knowingly and with criminal intent aids and abets in its commission, or, whether present or not, advises and encourages its commission. (Pen. Code, § 31.) Certainly the evidence here warranted such an instruction. The evidence shows that appellant could not have entered the premises himself because of his broken back and the cast. But the evidence also shows that he could drive a car and could operate a walkie-talkie. Such an apparatus was found in his possession, along with burglary tools and some of the stolen property, which appellant told the officer were his. This evidence tended to show that appellant was an aider and abettor of the crimes charged, and justified the court in giving the instruction on principals.

722

Appellant also objects to a correct instruction as to the law applicable to admissions, claiming that there were no admissions. Appellant has apparently forgotten his admission to the arresting officer concerning the things found in his apartment: "Well, they are in my possession, I guess they must be mine." He also admitted that he was the tenant of the apartment which he had rented under an assumed name. The trial court, under such circumstances, would have been derelict in its duty if it had not instructed on the law applicable to admissions.

The judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied June 6, 1956, and appellant's petition for a hearing by the Supreme Court was denied June 20, 1956.