[Crim. No. 5890.   Second Dist., Div. One.   Nov. 27, 1957.]

THE PEOPLE, Respondent, v. NOLAN PRUITT, JR., et al., Defendants; LAWRENCE I. PERRY, Appellant.

Lawrence I. Perry, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, the above named defendants were accused of the crime of robbery allegedly committed on or about June 8, 1956, in that by means of force and fear they took from Ronald Tray certain personal property valued at $600. It was further alleged that at the time of the robbery defendants were armed with deadly weapons. Defendants pleaded not guilty and were tried before a jury which found them guilty of robbery of the first degree. The jury also found as true, the allegation that defendants were armed as aforesaid. Appellant Perry was sentenced to state prison. From the judgment of conviction he prosecutes this appeal.

We regard the following as a fair epitome of the factual background surrounding this prosecution. Ronald Tray was employed at the "Simpson & Dennis Poultry" located at 2075 West 29th Place in Los Angeles County. He also resided there. The place was conducted by a Mrs. Simpson and a Mr. Dennis as an outlet for selling and distributing eggs. It served as well as a residence. On June 18, 1956, around 1

or 2 a. m. Mr. Tray and Mr. Dennis were inside the premises when the doorbell rang. Mr. Tray looked through the peep-hole of the door. Defendant Pruitt was there. Mr. Tray had never seen him before. Mr. Tray asked what he wanted. Defendant Pruitt said that Mrs. Simpson's daughter had sent him for some records. Mr. Tray opened the door. Defendant Pruitt stepped in and two other men jumped up on the porch. Mr. Pruitt said that this was a "stick-up" and displayed a revolver. The other two men rushed in behind him and they also had revolvers. They roused Mr. Dennis who was half asleep on the couch. Defendant Pruitt held Mr. Tray and Mr. Dennis at bay while the other two men looked in the other room. These two men had stocking caps over their faces, that is, ladies' stockings cut up a certain distance then tied in a knot at the top and pulled over the face.

All three men asked questions as to what was in the room. Mrs. Simpson's bedroom door was locked and one of the men who was wearing a stocking cap kicked it down with his foot. The three men ordered Mr. Tray and Mr. Dennis into this room. The guns were still displayed. The men kicked down Mrs. Simpson's closet door and searched the room thoroughly. They were there perhaps 20 minutes. Two of the men left together after first tying up Mr. Tray and Mr. Dennis with adhesive tape. One of the masked men lingered, then in about 10 seconds Mr. Tray heard the door slam. Mr. Tray and Mr. Dennis extricated themselves and Mrs. Simpson was summoned. She arrived in five or 10 minutes.

When the three men came in Mr. Tray was in a state of fear because of the guns exhibited. He noted the masked men were colored. When asked, "Did you notice anything unusual about anything concerning either of these two men?" Mr. Tray testified, "Yes. One thing in particular, they didn't seem to want to speak or talk too loudly in front of me, you see, that's one thing that buried in my mind." According to Mr. Tray, both men had hats on—one had a blue hat with a light band and was wearing a sport coat. One of the men was a little stockier than the other. Mr. Tray did hear one of the masked men say something in a low voice. At the time, the voice sounded familiar but Mr. Tray could not place it. Mr. Tray believed he had met appellant Perry prior to this occasion, at dice games. Appellant Perry and defendant Scandrett appeared similar in appearance to the two masked men.

Prior to the preliminary hearing, Mr. Tray saw appellant

Perry at the University Police Station and heard him speak. Mr. Tray noticed that the voice was similar to the voice above mentioned of one of the persons wearing a mask. Mr. Tray associated the similarity of voice with the man who kicked in the door.

LeRoy Dennis, Mrs. Simpson's brother, generally corroborated Mr. Tray's narrative as to what happened on the occasion in question. Mr. Dennis had been semidozing and only actually saw two men, who roused him up. They were wearing masks which could have been stocking caps, and had guns. As to whether he observed a man without a mask, he did not get a clear look. Prior to the episode in question, Mr. Dennis had consumed some alcoholic beverages and was "feeling the effect slightly." He was, however, sure that the men he saw were colored.

When Mrs. Hazel Simpson, coowner of the poultry establishment, arrived there in the early morning hours of June 18, 1956, in response to a call, she observed that the premises were not in the same condition as when she was last there. The last time she had been there was the prior afternoon, at which time there was nothing unusual in connection with the premises. When Mrs. Simpson arrived the early morning of June 18, she noted that her bedroom door had been kicked down, and her bathroom and closet doors kicked in; that all the contents of the drawers, cabinets and bedroom were "slung" around and that money was missing. She had approximately between $585 and $600 in her bedroom closet. Part of this money was in a money bag and part of it was in a picture frame. The picture represented a gift from the Shriners to Mrs. Simpson's husband on their 25th anniversary and some two to three hundred dollars in silver dollars were placed around the picture. The glass of the picture had been broken out, and the money removed.

Mrs. Simpson had a revolver (People's Exhibit No. 1), which had been in the top drawer of a chest of drawers in her bedroom. This revolver was there when Mrs. Simpson had been at the premises the afternoon prior to the events here in question. When she arrived at the premises the early morning of June 18, she found that the revolver was not there. She did not again see it until the preliminary hearing. Mrs. Simpson had purchased this revolver in Arizona and she kept the bill of sale in her wallet. The bill of sale (People's Exhibit No. 3) contained the number 18605.

John Frink, a police officer of the city of Los Angeles,

attached to the Harbor Division, had occasion to investigate an automobile in which appellant Perry and defendant Scandrett were riding on August 21st at about 9 p. m. at 28th and Pacific Streets. Officer Frink had received a call to the effect that a man was holding a theft suspect and upon arriving at the scene the officer was met by the victim of the theft who had the automobile in question stopped. Appellant Perry and defendant Scandrett were standing alongside of the car. As the officer recalled, the car was registered to appellant Perry. The officer found the .38 caliber Smith and Wesson Chief's Special 2-inch revolver, (People's Exhibit No. 1), under the righthand portion of the front seat of the car. It bore the serial number 18605. The officer asked appellant Perry who owned the gun. The latter replied that he did. Later, at the police station, the officer asked appellant Perry where he had purchased the gun. Appellant Perry said he had bought it from a friend but would not state who the friend was.

Loren Waggoner, police officer for the city of Los Angeles, attached to the University Division, arrested defendant Pruitt on October 6th at about 5:30 p. m. in the safety zone on the southwest corner of Jefferson and Arlington Boulevard. Prior to going to this location the officer had received a call to go there. On arriving there he met Mr. Tray. Mr. Tray directed the officer's attention to defendant Pruitt.

T. E. Nordin, police officer for the city of Los Angeles, attached to the University Division, arrested appellant Perry at the latter's residence, 2632½ South Budlong, on October 4 at about 8 p. m. Officer Nordin and his partner, Officer Boller, went to that location for the purpose of making this arrest. On arrival, Officer Nordin observed appellant Perry standing in the doorway talking to some other people. The officers arrested him at that time, then entered the premises. Officer Nordin found the stocking (People's Exhibit No. 2) in a drawer in the closet of the front room of the apartment. This stocking was similar in appearance to one which Mr. Tray observed worn over the faces of the two masked men.

Officer Nordin determined that defendant Scandrett lived at this same address as well as appellant Perry. The officer saw defendant Scandrett later, at the University Division Police Station. The latter was arrested when he came in there.

Following the arrest of appellant Perry, Officer Nordin had a conversation with appellant both in the living room of

the apartment and also at the police station concerning the gun which had previously been recovered from him (i.e., People's Exhibit No. 1). Appellant said he had bought it from a person on 5th Street. Officer Nordin asked the name of this person. Appellant said he did not know, that he was in a crap game.

Robert Wright, police officer for the city of Los Angeles, was one of the investigating officers in the case at bar. He had a conversation with the three defendants at the Police Administration Building on October 9th. Besides Officer Wright and the three defendants, another officer and a jailer were present. The three defendants were sitting around a table above five feet apart from one another. At first Officer Wright talked to all three of the defendants, then directed his questions to defendant Pruitt. In talking to the entire group, Officer Wright told them he had talked to each of them individually, that they had told him certain things and he wanted to clarify just what took place, and that he would talk to them one at a time, then they could have a chance to talk. The officer started with defendant Pruitt. He told defendant Pruitt that he wanted him to tell about the robbery that occurred on 29th Place several months ago. Defendant Pruitt hesitated, and looked at the other two defendants. Officer Wright said that defendant Pruitt had told the officer all about it, and the officer asked defendant Pruitt if he was masked on that job. The latter said no. The officer asked if the other two were masked. Defendant Pruitt said yes. The officer told defendant Pruitt to start from the first and tell the officer about it. Defendant Pruitt stated that he went to their house one night and they were talking about the robbery.

According to the testimony of Officer Wright, ''About that time Perry (appellant) jumped out of his seat and told him to shut up and not say anything to me, that he was just putting their heads in a noose and that he hadn't told us anything, and that tell me it was a big lie. So then I told Perry if he didn't be still I would have to ask him to leave and he kept yelling at him and threatening him to keep still, he didn't want him to talk. So I asked Perry to come with me out of the room and we went down the hall into another interrogation room about 6 feet away from that room and he wouldn't get in the room. He just kept yelling for him to shut up. And so then he immediately started in the room and he picked up a chair, raised it about halfway and Officer

Haggerty and myself had to use force to take the chair away from him and we had to handcuff him. And all the time he kept yelling back at Pruitt to shut up.'' The officer further testified that he used no force on appellant in an effort to induce him to confess to the robbery. That he ''fought with him (appellant) to put handcuffs on him after he became combative.''

The three defendants were sworn as witnesses in their own behalf and each denied committing the offense charged.

Appellant Perry could not remember exactly where he was at the time of the robbery, but denied any knowledge of it. He testified that the conversation he had with Officer Frink on the occasion when he was stopped in his automobile, was more than that related by the officer. Appellant's version of the conversation was, ''Well, he asked me where did I get the pistol, and I told him I bought the pistol in a crap game and he said, well, he made a statement something like this, he said, well, anyway he say he didn't believe I got the gun in a crap game. He told me, say a snub nosed .38, you know you can't go hunting with that, don't you? I said yes.''

With regard to his arrest on October 4, 1956, appellant testified that he received information that some police officers were looking for him; that he called several police stations and finally called University Police Station; that he talked with someone there and asked if they had a warrant for him; that the person he talked with said he did not know of anything offhand and if they did have one they would come out the following morning; that about twenty minutes later someone knocked at appellant's house door and that it was two women inquiring about an apartment for rent; that while he was talking to them, two officers came up and told him to go back into the house; that appellant sat on the couch and that one of the officers talked to him while the other searched through the house; that he was then taken to the station; that he had no conversation with the officers other than to ask what the warrant out for him was and that the officers did not say; that the stocking (People's Exhibit No. 2) was at the premises but that it did not belong to him; that he was almost positive it belonged to another person living there with appellant and defendant Scandrett; that this person wore a stocking cap at night.

With reference to the conversation at which all three defendants were present at the police building, appellant testified that Officer Wright told defendant Pruitt to tell them all

about the matter; that the officer told defendant Pruitt to tell what he (Pruitt) had told the officer; that defendant Pruitt started to say something and that appellant "cut in"; that defendant Pruitt could not have implicated appellant in the robbery but that appellant wanted to know what defendant Pruitt had to say; that appellant asked defendant Pruitt what he could have said about appellant; that the officer became angry and took appellant from the room and used violence on him, along with another officer and that then appellant was handcuffed; that he knew defendant Pruitt casually. On cross-examination appellant testified that defendant Pruitt did not implicate him in the room when all the defendants were present with the officers.

On rebuttal, the prosecution presented expert testimony showing that a comparison was made between fingerprints appearing on pieces of glass from the picture frame which contained the silver coins at the premises of the robbery and defendant Pruitt's fingerprints; and that defendant Pruitt's right thumb print corresponded with a print found on the glass which came from the frame.

■ As ground for reversal of the judgment, appellant first complains that the court "erred by not explaining to the jury during the course of the trial or during the conflicts of testimony presented by D. A. witnesses, the doctrine of reasonable doubt." Although the instructions were not brought here on this appeal since no application therefor was made, (Rules on Appeal, rule 33(b)), appellant concedes that the instructions were given the jury at the close of evidence and argument of counsel, but urges that the instruction on reasonable doubt should have been given to the jury, "during the conflicts of testimony" that was presented by the witness for the prosecution. Penal Code, section 1093, provides for the order of proceedings at the trial, and it is therein stated that at the conclusion of the arguments, "The judge may then charge the jury . . . ." That is the procedure followed in the instant case. ■ Appellant further urges that when the instructions were given, the court "read them in such a nonconformed and nonchalant manner that it would take some understanding of law to realize the meanings of his instructions and what he was attempting to say." No such objection was made at the trial (where appellant was represented by counsel) and it must now be presumed that official duty was regularly performed (Code Civ. Proc., § 1963, subd. 15).

Appellant's next contention is that the trial judge "showed prejudice against the defendant by assisting or attempting to assist the district attorney in the questions and cross-examination of appellant." This complaint is predicated upon the following incident which occurred during the direct examination of appellant:

"THE COURT: Mr. Perry, a while ago, you said you were surprised at the statements that Pruitt made. What statements do you mean?

"MR. CARTER (Appellant's counsel): Just a second——

"A. I didn't actually hear any statement.

"MR. CARTER: If your Honor please, I didn't hear him say I was surprised at the statement.

"THE COURT: I may be mistaken. Let's go back about 4 questions.

"(Record read by the reporter.)

"THE COURT: I guess I did understand.

"MR. CARTER: I apologize. You did understand."

When the record was read by the reporter it reflected that appellant had testified he was surprised at the statements defendant Pruitt made. ▓▓ The record clearly reveals that the trial judge was simply attempting to clarify the testimony. This was not only his right but his duty (*People* v. *Sanders,* 98 Cal.App.2d 703, 708 [220 P.2d 761]).

Equally without merit is appellant's next contention that the court erred in admitting conflicting testimony by Mr. Tray and Mr. Dennis (victims of the robbery) as to the number of persons involved in the offense. Mr. Tray testified there were three men, two of whom were masked. Mr. Dennis testified that he had been semidozing and only actually saw two men, who roused him up; that they were masked; that as to whether he observed a man without a mask, he did not get a clear look; that prior to the episode he had some alcoholic beverages to drink and was feeling the effect slightly. No objection was interposed to the testimony on the ground now urged and appellant's complaint at this time could on that account he held unavailing. However, an objection at the trial would have been equally unavailing because appellant's objection amounts only to a challenge of the credibility of the witnesses. Since no inherent improbability appears in the testimony of either witness as to what he observed (*People* v. *Braun,* 14 Cal.2d 1, 5 [92 P.2d 402]), appellant's challenge lacks substance. The credibility of witnesses is for the jury

594

to determine (*People* v. *Boyce,* 99 Cal.App.2d 439, 443, 444 [221 P.2d 1011]).

■ Appellant next asserts that the district attorney committed prejudicial error in questioning Mr. Dennis, a witness for the prosecution, in that the prosecutor "kept insinuating and insisting throughout the examination of this witness that there were three (3) men involved while the witness stated there were two," and further that the deputy district attorney "went on to insinuate that this witness Mr. LeRoy Dennis was drunk during the time of the robbery." After the witness testified that he saw only two men, the following occurred:

"Q. (by Deputy District Attorney): Tell us, if you can remember, Mr. Dennis, about how many drinks of what type you had there before these 3 men came in on that evening? A. Well, I don't know exactly. I had been drinking, not too much, but I had been drinking.

"Q. Were you feeling the effect of the drinks you had had? A. Yes, slightly."

It is at once apparent that the questions propounded to the witness sought only to develop the true circumstances with regard to what he observed and his capacity for such observation.

■ What we have just said is also applicable to appellant's contention that the prosecutor improperly "insinuated" that defendant Pruitt withdrew his confession because he was afraid of appellant. The witness was asked if he was not presently afraid of appellant. The interrogatory was proper and relevant as affecting the credibility of the witness and to ascertain what might be actuating the testimony given by the witness as to retracting his confession (*People* v. *Krug,* 10 Cal.App.2d 172, 176 [51 P.2d 445]).

■ Appellant next claims error in the admission into evidence "against all three (3) defendants," a recording of defendant Pruitt's confession, in that it was involuntarily made. Officer Wright testified that defendant Pruitt's statements were made freely and voluntarily. Appellant refers to contrary testimony by defendant Pruitt. In such a situation the admissibility of an alleged confession rests in the sound discretion of the court. It does not appear that the court abused this discretion in the case at bar. Furthermore, appellant is in no position to complain. The court admonished the jury clearly and explicitly that any statements made by defendant Pruitt in the conversations being called for by the questions were to be considered only in connection with the

case of defendant Pruitt. When the aforementioned recording of one of these conversations was offered, the prosecuting attorney specified that it was offered solely against defendant Pruitt, as with the last conversation. The court was not asked to reiterate the admonition. It is presumed that the jury heeds the admonitions of the court. Appellant's rights were amply protected and no prejudice to him is demonstrated, nor can it reasonably be inferred.

■ Appellant's further claim that assuming defendant Pruitt's confession was free and voluntary, ". . . it did not tend to corroborate with other evidence offered against the defendant and appellant and that this confession was not sufficient to convict the appellant alone," is untenable. The answer to this contention is twofold. In the first place, such evidence was not relied upon to convict appellant. As heretofore noted, it was offered by the prosecution as against defendant Pruitt, and the court so instructed the jury. Secondly, the verdict of the jury is sufficiently supported by other testimony such as similarity in appearance and voice between appellant and one of the participants in the robbery, and by testimony of appellant's possession of a gun taken from the scene of the robbery, coupled with the explanation offered by him regarding his possession thereof (*People* v. *Mora,* 139 Cal. App.2d 266, 271, 272 [293 P.2d 522] ; *People* v. *Castro,* 68 Cal.App.2d 491, 494 [157 P.2d 25] ).

Appellant challenges the validity of the search of his home at the time of his arrest by Officer Nordin, upon which occasion a stocking cap, heretofore referred to in the evidentiary narrative, was taken by the officer. Appellant contends the search was made without a warrant, was not incidental to arrest or by consent.

■ At his trial, appellant made no objection to the introduction of the People's exhibits on the ground they were obtained through an illegal search and seizure. Therefore, appellant is in no position to complain for the first time on appeal (*People* v. *Kitchens,* 46 Cal.2d 260, 262 [294 P.2d 17] ; *People* v. *Millum,* 42 Cal.2d 524, 526 [267 P.2d 1039] ).

■ Furthermore, the record does not reflect that appellant made any *prima facie* showing in the trial court of an alleged illegal search or seizure. The presumption therefore is that the officers acted within their authority (*People* v. *Holguin,* 145 Cal.App.2d 520, 522 [302 P.2d 635] ). Without here repeating the pertinent testimony as to Officer Nordin's visit to appellant's home, it will suffice to say that the former went to

the home of the latter to arrest him. According to the officer's testimony he did just that. He questioned appellant concerning the gun taken from the scene of the robbery with which we are here concerned, and which weapon had previously been taken from appellant. There can be no substantial doubt that the officer had reasonable cause for believing the person arrested (appellant) had committed a felony. The arrest was valid under Penal Code, section 836, subdivision 3 (*People* v. *Holguin, supra,* p. 522). And, we are also satisfied that the trial court was authorized to reasonably conclude that the search was incident to and properly within the scope of the arrest (*People* v. *Winston,* 46 Cal.2d 151, 162 [293 P.2d 40]). No prejudice or violation of appellant's constitutional rights appears.

The judgment is affirmed.

Fourt, J., and Drapeau, J.,* concurred.

*Assigned by Chairman of Judicial Council.