[Crim. No. 11357.   Second Dist., Div. Four.   Nov. 10, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. GARY GLENN GARRISON, Defendant and Appellant.

M. SigBert Charig, under appointment by the Court of Appeal, and David C. Marcus for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—Defendant Garrison, along with Edward Ballard and John Lee, were charged with three counts of armed robbery (Pen. Code, § 211) and one count of burglary (Pen. Code, § 459). At the first trial the jury was unable to reach a verdict as to Garrison, though the other two were

convicted. At the second trial Garrison was convicted on all four counts and was sentenced to state prison. The trial judge then granted a stay of execution and fixed bail on appeal at $27,500.

At defendant's request, and upon his representation that he was without funds, this court appointed counsel to assist him on his appeal. A brief, arguing for reversal upon specified grounds, was filed by the appointed attorney. When the case was called for oral argument, Attorney David Marcus arose and asked to be substituted as attorney for the appellant. Since he had no written authorization, and the appellant was not present to give consent, the argument was postponed to the next monthly calendar. The following month appellant appeared in person and requested that Mr. Marcus be substituted as his attorney. The court then made an order relieving the court-appointed attorney and substituting Mr. Marcus, who was present. Attorney Marcus was thereafter permitted, at his request, to file a supplemental reporter's transcript containing the arguments of counsel at the close of the trial, and a supplemental brief. Mr. Marcus also argued the case orally.

In this opinion we deal with all of the contentions raised by defendant through either of his attorneys here. These contentions relate to three subjects:

(1) The admission of evidence of a conversation between defendant and his wife in the jail.

(2) The argument of the prosecutor.

(3) The competence of defendant's trial attorney.

### The Evidence

Though no question is raised as to the sufficiency of the evidence, a statement of facts is essential to illuminate the legal issues.

On Saturday evening, November 21, 1964, Mr. and Mrs. Bill Nardoni went to a restaurant for dinner. When they returned to their Glendale home about 8:10 p.m., accompanied by Mr. and Mrs. Margid, Mr. and Mrs. Erwin, and the Erwins' two children, they were confronted by two armed men. Each of the two had one of Mrs. Nardoni's stockings pulled over his head and face. A third stranger attempted to conceal his face with a canvas glove. The two gunmen held the Nardonis and their companions prisoner, threatened to kill them if they did not cooperate, and took Mr. Nardoni's ring, watch and money, Mrs. Margid's ring,

Mr. Erwin's money and Mr. and Mrs. Margid's wristwatches. After the robbers had left, the Nardonis discovered that the house had been ransacked and that furs, clothing and other valuables were missing. The Glendale police were called and given a description of the robbers.

A few days later Mr. and Mrs. Nardoni and Mr. Margid went to the Glendale police station and assisted a police technician to construct a picture of one of the robbers. By matching this construction with actual photographs, the police concluded that Edward Ballard was probably the man. They showed Ballard's photograph to Mr. Nardoni, who promptly identified him. Ballard was arrested on Friday, November 27, and was identified by the victims as one of the gunmen. Following Ballard's arrest a bail bond agency reported that it had had inquiries about Ballard from a person who gave his name as John on one occasion, and as Lee on another occasion.

Officers waited in the vicinity of the bondsman's office on Saturday, November 28, and observed two men who answered the description of the other two robbers. The two men were arrested and identified as John Lee and Gilbert Smith, both of whom were employed at a bar in Paramount called the Music Box. Lee was identified by the victims as the man with the canvas glove. After interrogating Smith the police were satisfied he was not involved and released him.

It was then reported that a man named Gary was making inquiries about Ballard at the bail bond office on Sunday, November 29. Police learned from Smith that a former waitress at the Music Box was married to Gary Garrison, who fitted the description of the missing robber, and who had a police record of robbery and burglary. The following day, November 30, defendant Garrison was arrested.

At the trial Mr. Nardoni, Mrs. Nardoni, Mr. Erwin, Mrs. Erwin and Mr. Margid all positively identified defendant Garrison as one of the gunmen. They said the stocking over his face had been very sheer, and they could see his features plainly.

Defendant testified that he had been at his apartment in Bellflower with his wife the entire evening of November 21. His wife supported this alibi. Mrs. Garrison's brother testified that he was at defendant's home with him between 7:30 and 8:15 p.m. Mrs. Hill, a friend of Mrs. Garrison, testified that she telephoned defendant at his apartment and spoke with him between 8:15 and 8:30 p.m. that evening. Mrs. Gar-

rison's parents both testified that they had telephoned defendant at his apartment and had spoken with him at about 7:30 p.m.

Detective Sergeant Stenberg of the Glendale police testified to a conversation he had with defendant after the arrest and after defendant had been advised of his rights.[1] In this conversation defendant told Sergeant Stenberg that he had not been one of the three who committed the robbery but he knew who they were and where the loot was, but that he wouldn't snitch.

Following this the sergeant permitted defendant to speak with John Lee for about 10 minutes. The sergeant then asked if he would like to make a further statement and defendant said, "No, we'll take it to court."

While defendant's wife was on the witness stand she was asked, on cross-examination, and without objection, concerning a conversation she had with her husband at the police station on December 1, 1964. This visit had taken place in a room where she and the defendant were face to face on opposite sides of a glass partition, so that they could converse only through a telephone instrument. The witness testified that she thought defendant had said he thought he knew who was "in on the Nardoni job." She said she didn't remember if he had said he "knew where the merchandise was because John had told him." The prosecutor then put to the witness a series of leading questions, containing the exact words of a conversation between the witness and the defendant. Portions of it she testified were correct, some portions she denied, and as to other parts she expressed uncertainty.

Defendant did not testify until after his wife's examination had been completed. On cross-examination he was asked about the December 1 conversation, sentence by sentence. The only portions which he admitted were (1) his statement that "They have $20,000 worth of merchandise and they want to get it back," and (2) the statement of his wife that she wished he would tell the police everything that he knew. Defendant qualified this by adding that his wife had said, "If I knew anything." Every other portion of the conversation, as put to him sentence by sentence, he denied.

In rebuttal, Sergeant Stenberg testified that he had monitored the December 1 conversation of defendant and his wife

---

[1]No objection was made to this testimony at the trial and no contention is made by either of defendant's appellate attorneys that this was improper interrogation or that this conversation was inadmissible.

and had tape-recorded it. The district attorney questioned Stenberg as follows:

"Q. Now I am going to ask you these questions and ask you if this is what you heard while you were there on the date and whether these are the questions that were also on the tape recording.

"Did Mr. Garrison say: 'I was with you because I kept calling Johnny to find out'?

"A. Yes, sir, he did."

"Mr. Martin [Defendant's attorney]: Your Honor, I am going to object to this—on second thought I withdraw my objection. I'd like to hear Officer Stenberg's testimony myself. Excuse me."

Thereupon the prosecutor put to the witness a series of questions by which he elicited that the recorded conversation included the following statements:

Wife: " 'I wish you'd tell them because it is the only way to help you. With the other people picking you out it is not being a rat or a fink.' "

Defendant: " 'They want the merchandise back. People are picking my voice out not seeing my face.

" 'I know that Friday, Saturday and Sunday night I was with you because they went to Vegas Sunday and we were calling the whole time.' "

Wife: " 'Sal [Mrs. Garrison's brother] left [our] house that evening at 9 o'clock.' "

Defendant: " 'You remember I called all day Sunday because I couldn't get in touch with them until Monday.

" 'Gloria, they want me to snitch, that's all.' "

Wife: " 'Who turned you in?' "

Defendant: " 'Gil.

" 'It's still snitching so if I go up there and tell them I can get the merchandise back they are still going to file on me.

" 'They have $20,000 worth of merchandise out they want to get back.' "

Wife: " 'And you know where it is at?' "

Defendant: " 'Yes, I know where it's at, you're damn right I know where it's at, and I ain't telling these punks shit because they told me they are going to file on me anyway.' "

Wife: " 'Do you know who else was involved?' "

Defendant: " 'I know one, two of the people who was, or it was one of two people, but I'm not going to put them in jail.' "

Wife: " 'If you don't you are going to be there.' "

Defendant: " 'No, I'm not either.' "

Wife: "Gary, these people are picking you out.

" 'I wish you'd just tell them what you know, please, Gary.' "

Defendant: " 'Look, that's just sure going to put John and Ed in the penitentiary.' "

Wife: " 'They know that they went up to Vegas to get rid of some of that stuff.' "

Defendant: " 'They didn't get rid of but one thing in Vegas.

" 'And I'm telling you, Gloria, they are going to try to put me in the penitentiary anyway and if I go tell them that it's just going to help them out.

" 'Just my knowing anything is going to help me in the penitentiary and they can't prove a damn thing on me.

" 'Not one thing, not even the association, not even what I'm guilty of can they prove on me.

" 'I know when it happened.

" 'I didn't see them until they got back from Vegas.' "

Defendant or Wife: " 'We found out that Ed and John were in Vegas when we called Joanne from the folks' home.' "

Defendant: " 'I'm going to ask them to drop the charges if I get the merchandise back.' "

Wife: " 'How are you going to tell them that if you are not involved?' "

Defendant: " 'They wanted me to help them get rid of it.' "

Sergeant Stenberg testified that the whole conversation took about 10 or 15 minutes, that the recording included other portions which had not been referred to in the testimony, and that the entire tape would be available to defendant's attorney if he wished it. Defendant offered no further evidence.

The jury was presented with a clear-cut issue of credibility. The five victims all positively identified the defendant. The defense witnesses just as positively placed him at home some 20 miles away. The extrajudicial statements of the defendant to Sergeant Stenberg and to his wife were consistent with each other and consistent with innocence of the offenses charged. Though these statements reflected some special knowledge on the subject, and at one point there was the admission that he was guilty of something, the whole tenor of

his statements was that he was not one of the gunmen who had invaded the Nardoni home. Mrs. Garrison's comments in the recorded conversation indicated that she believed him and thought he could clear himself by telling what he knew.

But defendant's credibility was destroyed by his total denial of the statements made in the December 1 conversation. He even denied some statements which his wife had said were made. After hearing the testimony of Sergeant Stenberg, and his offer to produce the tape, the jury could not have doubted that the conversation was as the sergeant described it.

### Admissibility of the December 1 Conversation

It is unnecessary to decide whether the conduct of the police in monitoring and recording the conversation between defendant and his wife was such an impropriety as to make inadmissible the evidence obtained thereby. The evidence which resulted includes the cross-examination of defendant and his wife, and the direct examination of the officer in rebuttal. No objection was made to any of this, though at one point counsel started to make an objection and then withdrew it.

■ One of the fundamentals of appellate review is that, except in special circumstances not present here, the admissibility of evidence will not be reviewed on appeal in the absence of a sufficient objection in the trial court. (*People* v. *Robinson,* 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].) ■ Likewise, where a party seeks to suppress evidence under a claim of constitutional or statutory privilege, his privilege is lost by failure to assert it at the appropriate time. (*Rogers* v. *United States,* 340 U.S. 367, 370 [95 L.Ed. 345, 348, 71 S.Ct. 438, 440, 19 A.L.R.2d 378, 381-382] (self-crimination) ; *People* v. *Kroeger,* 61 Cal.2d 236, 246 [37 Cal. Rptr. 593, 390 P.2d 369] (confidential communication).)

The failure of counsel to object at the trial does not ordinarily indicate either incompetence of counsel or unfairness to the client. The system of objections is a useful tool in the hands of a trained professional for the exclusion of matter which should not be received into evidence. But the indiscriminate use of objections, solely because they are available, aids neither the client nor the cause of justice. ■ The choice of when to object and when to allow the evidence to come in as offered is inherently a matter of trial tactics. Ordinarily the tactical decisions of trial counsel will not be

reviewed with the hindsight of an appellate court. (See, *e.g.*, *People* v. *Brooks,* 64 Cal.2d 130, 139-140 [48 Cal.Rptr. 879, 410 P.2d 383] ; *People* v. *Reeves,* 64 Cal.2d 766, 772-773 [51 Cal.Rptr. 691, 415 P.2d 35].) The decisions which counsel must make in the courtroom will necessarily depend in part upon what he then knows about the case, including what his own client has told him. There may be considerations not shown by the record, which could never be communicated to the reviewing court as a basis for its decision. Thus, the appellate court's inability to understand why counsel did as he did cannot be a basis for inferring that he was wrong.

Nevertheless, in view of the contention made by defendant on this appeal, we point out that the record does affirmatively show a perfectly sound reason for withdrawing any objection to Sergeant Stenberg's testimony about the tape recording. It will be remembered that Stenberg had testified, during the People's case in chief, about defendant's statement that he knew the robbers and knew where the loot was. The December 1 conversation in the visitors' room first came to the jury's attention during the cross-examination of the defendant and his wife. That conversation contained no admission of guilt. It was consistent with what defendant had told the police: He knew about the robbery but hadn't participated. If the jury would believe this, defendant would be acquitted. The testimony of Sergeant Stenberg, as to what was on the tape, confirmed this theory of defense. On the other hand, if an objection to Sergeant Stenberg's rebuttal testimony were made and sustained, the jury would never know that in the December 1 meeting the defendant had made no admission of guilt to his wife and that his wife had talked to him as though she believed he were innocent. Counsel could reasonably have concluded that the wiser course was to clear up the mystery, rather than allow the jury to speculate.

### The Argument to the Jury

Read as a whole the argument of the prosecutor appears to be a vigorous but dignified comment upon the evidence. With one exception, to be mentioned later, there were no references to matters which the jury could not properly consider. Nowhere was there any intimation that the prosecution had knowledge or information beyond that shown in the evidence. There was no attempt to bolster the case by invoking the prosecutor's personal opinion or his personal endorsement of the People's witnesses. Indeed, the deputy district attorney sought to forestall any such intimation by stating at the

beginning of his argument: "First of all I want you to know that anything I say is not evidence because I was not a witness. I don't know anything more about the case than you have heard from the witness stand. . . . If I do misquote somebody, I'm not doing it intentionally, it is because my memory may not be as good as it should be."

Throughout the entire argument defendant made no objection, no charge of misconduct, and no request for an admonition to the jury. Now defendant demands a reversal because of four aspects of that argument, which will be discussed separately.

Defendant's first point is that the prosecutor asserted in argument that defendant "took the stand and committed perjury"; that the prosecutor said of defendant's wife, "She got up here and she perjured herself. That's a felony"; and that on other occasions during argument the words "perjury" and "lie" were used to characterize the defense testimony.

The thrust of the prosecutor's argument was that the testimony of these witnesses about the December 1 conversation was wilfully false; and that if they wouldn't tell the truth on that subject they shouldn't be believed when they testified that defendant was at home on November 21. This was a perfectly proper suggestion, based entirely upon the evidence which the jury was bound to consider. The argument was not an appeal to passion, but to reason. The words "lie" and "perjury" are the expressions commonly used to describe wilfully false testimony, and there is no reason why a prosecutor must resort to circumlocutions when discussing this distasteful but pertinent subject. The prosecutor's statement that perjury is a felony is no more than a reminder of the gravity of the conduct. It is arguable that, as a mark of untrustworthiness, perjury is more significant than other kinds of falsehood.

In *People* v. *Rosoto,* 58 Cal.2d 304, 360 [23 Cal.Rptr. 779, 373 P.2d 867], the prosecutor's statement, of that defendant, that "he is shown to be a liar" was held not to be improper.

In *People* v. *Muir,* 244 Cal.App.2d 598, 601 [53 Cal. Rptr. 398], the court held there was no misconduct of the prosecutor "in suggesting in his argument that defendant committed perjury when he testified. . . ."

In *People* v. *Baker,* 183 Cal.App.2d 615, 624 [7 Cal.Rptr. 22], the use of the word "lie" to characterize the testimony of defendant's witnesses was not improper.

In *People* v. *Mora,* 139 Cal.App.2d 266, 272-273 [293 P.2d 522], the court said: "When a witness tells one story when arrested and another story on the trial, one of the stories is untrue, i.e., is a lie, and the person who tells such conflicting stories can properly be characterized as a 'liar.' All of the appellants told different stories at different times. Thus, the prosecutor's statements, although harsh, were in the realm of fair comment."

Defendant bases his argument here upon language found in *People* v. *Reese,* 220 Cal.App.2d 143 [33 Cal.Rptr. 561], and *People* v. *Conover,* 243 Cal.App.2d 38 [52 Cal.Rptr. 172].

In *Reese* the district attorney committed misconduct in arguing to the jury that the defendant had a duty to disclose his alibi to the police at the time of his arrest, and that his failure to do so was inconsistent with innocence. In reversing the conviction, the appellate court placed its decision both upon that argument and upon the district attorney's statement that the defendant's witnesses "have committed perjury." The court said (at p. 147): "The critical objection is that by this technique the district attorney is able to obliquely impeach a witness by charging him with the commission of a felony of which he has not been convicted. A witness on the stand cannot be impeached by an accusation of perjury unless the witness has been convicted thereof, since impeachment of this character stems from a prior conviction of a felony. An attorney should not be permitted to accomplish by argument that which he is precluded from doing by cross-examination."

The prosecutor's argument in the *Reese* case unquestionably constituted misconduct, judged by well-established rules. But we are unable to follow the court's reasoning as to the effect of the word "perjury." The defendant was impeached not by the prosecutor's accusation, but by the evidence which showed that he had been wilfully false. In ordinary speech, to say that a man "committed perjury" does not mean that he has been convicted, and the jury surely would not take it that way.

In the *Conover* case the prosecutor was guilty of misconduct in expressing his personal belief in the unreliability of defense witnesses, and in arguing that the defense was fabricated because no defense evidence had been offered at the preliminary examination. In reversing, the appellate court also discussed the prosecutor's use of the words "lying" and

354

"perjury" to characterize some of the testimony. The court said (38 at p. 45) "The epithet 'lying,' while blunt, was accurate" and not improper. But the use of the word "perjury" was disapproved upon the authority of the *Reese* decision.

We do not believe it makes any difference to the jury whether the prosecutor argues that a witness deliberately lied in his testimony or whether he says the witness "committed perjury." The distinction which the *Conover* opinion draws in order to be consistent with *Reese* is not the kind of distinction which marks the boundary between proper and improper argument. The test, as applied in such cases as *Rosoto, Muir, Baker* and *Mora, supra,* is whether the argument was fairly based on the evidence. Both on principle, and upon the weight of authority, we think that standard is the applicable one here.

█ The evidence in the case includes the picture which the police technician drew, based upon the description which Mr. Margid and the Nardonis had given a few days after the robbery. While Mr. Nardoni was on the witness stand he identified the picture and also identified Ballard, who was present in the courtroom. In argument, the prosecutor reminded the jurors of this, and asked them to recall how closely the drawing resembled the man. This evidence was, in effect, a demonstration of the accuracy of the robbery victims' ability to observe and recall the features of a man whom they had seen only through a stocking. The demonstration was a part of the evidence, and it was not improper for the prosecutor to talk about it.

Defendant calls attention to what the prosecutor said about the defense of alibi. The subject was opened by defendant's trial attorney. After referring to the witnesses for the defense as "alibi witnesses," he added: "I hate to say 'alibi witnesses' because we hear about the alibi witnesses on the 'Untouchables' and that sort of thing and I think the words 'alibi witness' has [*sic*] come to be misused in legal terminology; I will call them defense witnesses."

In reply, the prosecutor pointed out that "alibi" as a legal defense means that the defendant was elsewhere when the crime was committed; but because this defense is so easily misused the term now has a bad connotation, meaning "the fix is in." He followed this by contrasting the testimony of the alibi witnesses with that of the People's witnesses. Defendant seems to feel that this argument was an attack

upon alibi defenses in general. Rather it was an attack upon the credibility of the witnesses who supported the defense, and as such was fair comment upon the evidence.

The prosecutor did on one occasion make a reference to an incident which was not the proper subject of argument. Early in the trial, after the first witness, Mrs. Nardoni, had identified the defendant and had identified the stocking which he had worn, the prosecutor asked that defendant put the stocking over his face. Defendant's attorney objected upon the ground that defendant had not taken the stand. The objection was sustained. Later on, while defendant was on the witness stand, at the request of his own attorney defendant put the stocking over his head and gave a demonstration of speaking through it.

In argument at the close of the evidence, the prosecutor referred to these events and pointed out that the defendant had not put on the stocking until all of the People's witnesses had left the courtroom, and therefore these witnesses had not had the opportunity to say, " 'Yes, that's the way he looked that night in the stocking.' "

Whether the trial court's sustaining of the objection was correct or not,[2] the jury and the prosecutor were required to respect it for the purpose of that trial, and to assume that the defendant was privileged to abstain from demonstrations until he volunteered. No adverse comment upon his exercise of this privilege would be appropriate.

Nevertheless, we cannot believe that what the prosecutor said about this could have affected the result. The comment referred to an event which had occurred in the jury's presence. Defendant himself allowed the jury to look at his face through the stocking, so as to judge whether the victims' identification testimony was credible. Neither a demonstration in the presence of the People's witnesses, nor defendant's refusal to demonstrate, could add anything to the strength of the identification testimony. The five prosecution witnesses said positively that they had seen defendant's features through the stocking and no one could have doubted that they would have said the same thing if defendant had put the stocking on in their presence.

The failure of defendant's counsel to object to the prose-

[2]See *Schmerber* v. *California*, 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826], and *People* v. *Graves*, 64 Cal.2d 208, 210 [49 Cal.Rptr. 386, 411 P.2d 114], fn. 1, both of which cases came down after the trial of this action.

cutor's argument indicates that he too regarded the incident as harmless. Had the point been made, the trial court could have straightened it out with a prompt explanation to the jury.

### The Competence of the Defendant's Trial Attorney

Defendant's argument here is that the case comes within the rule announced in *People* v. *Ibarra*, 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]. In that case the defendant's attorney, in response to a question of the trial judge, stated that he knew of no grounds to object to certain evidence. The Supreme Court pointed out that the evidence was subject to objection under a commonplace rule, and that counsel's admitted ignorance of the applicable law reduced the trial to "a farce and a sham." The *Ibarra* case does not hold that the failure of an attorney to object is by itself an indication that the attorney lacks the skill and diligence which are requisite to the proper exercise of his duties. ■ Subsequent decisions have adhered to the rule that counsel's failure to make objections, or his consent to informality in the introduction of evidence, does not reflect any impropriety. (*People* v. *Reeves*, 64 Cal.2d 766 [51 Cal.Rptr. 691, 415 P.2d 35]; *People* v. *Robinson*, 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].) In the *Reeves* case the Supreme Court said (at p. 774): "Defendant has the burden, moreover, of establishing his allegation of inadequate representation 'not as a matter of speculation but as a matter of demonstrable reality.' "

In *People* v. *Brooks*, 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383], the court said: "In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel."

A review of the record at bench fails to disclose any basis for asserting that counsel lacked knowledge, ability or industry. There is not even any legitimate ground for hindsight criticism of his tactics. The critical weakness of defendant's position at the trial (apart from the positive testimony of five eyewitnesses) was his resort to falsehood at a time when the truth would have served him better. It is not easy for counsel to find tactics effective to protect such a client.

■ Although defendant has not raised the point we cannot avoid noticing that the sentencing of defendant on all four counts violated Penal Code section 654, which, as inter-

preted by the Supreme Court in *Neal* v. *State of California,* 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839], prohibits multiple punishment of criminal acts done for a single objective. The burglary charged in count I was for the purpose of committing theft from the Nardoni home. This was also the objective of the three robberies which were committed within that house and which are the subject of counts II, III and IV. Hence defendant may not be punished both for the burglary and the robberies. (*People* v. *Jones,* 211 Cal.App.2d 63, 73 [27 Cal.Rptr. 429].) ▮ This is so even though all of the sentences have been ordered by the trial court to run concurrently. (*People* v. *Quinn,* 61 Cal.2d 551, 555 [39 Cal. Rptr. 393, 393 P.2d 705].)

▮ A sentence on each of the three robbery counts is proper because each involved a different victim. (*Neal* v. *State of California, supra,* at pp. 20-21.)

. The judgment is modified by striking therefrom the sentence for burglary as charged in count I. As so modified the judgment is affirmed.

Jefferson J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 4, 1967. Peters, J., was of the opinion that the petition should be granted.