[Crim. No. 12425.   Second Dist., Div. Four.   Nov. 27, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CARLOS IGNACIO BARRETO, Defendant and Appellant.

Carlos Ignacio Barreto, in pro. per., and Irving S. Feffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J. — Defendant was charged with the murder of his wife. A jury found him guilty of voluntary manslaughter, a lesser included offense. He appeals from the judgment of conviction and from the order denying his motion for new trial,[1] contending that his confessions were inadmissible because made involuntarily and in violation of his right to counsel, and, further, that evidence used against him was obtained as the result of illegal searches. The body of the victim was never found and there were no eyewitnesses to the killing. Proof of the *corpus delicti* was by circumstantial evidence.

While no question is presented concerning the sufficiency of the evidence, to view the issues in proper perspective requires a summary of the facts.

Until 1964, defendant and the victim, Magdalena, lived in Colombia, South America. In that year they came with their child to live in the United States. In June of 1964, they moved to Los Angeles and lived in an apartment on South Vermont Avenue. In February 1965, Margarita Mora, a close friend of Magdalena, and also from Colombia, came to Los Angeles and moved in with them. On April 19, 1965, during an argument witnessed by Miss Mora, defendant struck Magdalena and said "You provoke me to kill you." When they began to exchange blows Miss Mora called the police. From this time until Miss Mora moved out of the apartment

---

[1] The order denying a motion for new trial being nonappealable, the appeal therefrom is dismissed. (Pen. Code, § 1237.)

in the latter part of June, defendant and Magdalena did not speak to each other. They communicated only through Miss Mora.

Miss Mora worked for the same company as Magdalena and they continued to see each other after Miss Mora moved out. The two women decided to pool their money for a car to drive to work. On the evening of July 9, 1965, they went to a dealer with two friends, Carlos and Elizabeth Ordonez, and agreed to buy a certain automobile. They were to return at 11 a.m. the next day, a Saturday, to make the down payment. The Ordonezes were to be the co-signers on the contract and were to accompany them. After leaving the dealer that Friday night, Magdalena, and the four-year-old child of defendant and Magdalena who was with them, were driven back to the Vermont Street apartment by the Ordonezes. They dropped Magdalena and the child off at about 10:30 p.m. Neither the Ordonezes nor Miss Mora saw Magdalena again.

When she did not keep her appointment the next morning at the automobile dealer, the Ordonezes and Miss Mora telephoned the apartment several times but received no answer. They went to the apartment and found the blinds pulled and no one at home. The manager opened the door for them. The apartment was in disarray and some of Magdalena's clothes were hanging on a closet door. Throughout that day and evening they attempted to locate Magdalena. They called the police and several hospitals. On Sunday, Mrs. Ordonez called the apartment again. Defendant answered and told her that Magdalena had gone to Las Vegas for the weekend; that she left Friday night. When Mrs. Ordonez stated, ''that couldn't be possible because we took her home Friday night at 11:00 o'clock,'' defendant stated ''Well, I don't know. She went to Las Vegas for the weekend.''

That night Miss Mora telephoned defendant's apartment and asked him if he knew the whereabouts of Magdalena. Defendant answered ''No. She went for a weekend to Las Vegas, in a car, the latest model, with a man.'' He told her that when he returned home at 8 a.m. on Saturday morning, he found the child alone in the apartment. Miss Mora again called the apartment after work the next day. Defendant repeated the same story, adding that Magdalena had gone to Las Vegas with a man named Jamie Gonzales. Miss Mora had known a man by that name in Colombia but not in Los Angeles.

The records of Magdalena's place of employment indicated

that Friday, July 9, 1965, was the last day she appeared for work. She never collected $63.20 in back wages.

On the night of July 9-10, 1965, Mrs. Baskette, who occupied the apartment directly below defendant's apartment, was asleep when, at about 1:30 a.m., she was awakened by a noise. It was a "hard thump" on the ceiling of her apartment. A few seconds later she heard another "hard bump" which sounded like "something real heavy" had been dropped on the floor.

On Saturday Mrs. Baskette did not see Magdalena doing the wash as was her usual custom. She never saw Magdalena again. On Sunday morning Mrs. Baskette observed defendant leave the apartment carrying a large and apparently heavy bundle over his shoulder; "it pulled very heavy on his shoulder." The bundle was covered with a sheet, the four corners of which had been tied together. Mrs. Baskette saw defendant return with his child later that afternoon. Defendant was wearing beach attire.

Miss Robillard also occupied an apartment in the building where defendant lived. When she went to the laundry room on Sunday, she observed that defendant had an automobile tire in the laundry room and was washing it.

On July 12, 1965, an "alien's change of address card" was mailed to the Immigration and Naturalization Service. The signature of the person reporting the change of address, Magdalena Barreto, was signed by defendant.

On July 13, 1965, defendant gave the manager of his apartment notice that he was moving out. He left on July 31.

The Los Angeles County Coroner's office had no record of the death. during this period of time, of any Magdalena Barreto or of any person whose name was similarly spelled. Records are kept of all accidental deaths. Nor was there an unidentified female body from an automobile accident during this period. The Los Angeles Police Department traffic records showed no report of any automobile accident involving anyone named Magdalena Barreto.

Defendant wrote two personal letters in Spanish to persons in South America. (People Exs. 12 and 13.) One letter, dated July 8, 1965, included the statement, "I have a series of problems, amongst others, involved in something of a homicide. I will explain. Up to now there are no proofs." The other letter, dated September 4, 1965, and addressed to defendant's aunt, stated that Magdalena was killed in an automobile accident. In explaining the accident defendant

stated, ''she crashed and fractured her skull and died instantly; I believe God wanted it this way; well, the three of us always went out together and that night I didn't want to go out and I let her go to the Hollywood Bowl to a comedy. Upon returning a front tire blew out and she lost control and turned over several times and the car was all smashed.

''I didn't communicate anything to her family and I'll be grateful if by chance you should meet with some of them, do not act as if you know; well, they are dirty people and they behave themselves badly with her.''

Sergeant Williams was an investigating officer on the case. On Sunday, July 11, 1965, he learned of Magdalena's disappearance when Miss Mora and the Ordonezes came to the police station.

On July 15, defendant went to the station at the invitation of Sergeant Williams. He talked to Williams and Sergeant Mejia. The latter was assigned to the case because he was fluent in the Spanish language. The conversation was in Spanish and was translated by Mejia. Defendant was asked what he knew about his wife's disappearance. He related that he had not seen her since he went to work on the morning of July 9, 1965; he had not gone home after work because his wife often left on the weekend and left him to take care of their child; he went to a movie that night and later to a bowling alley; from 2 to 7 a.m. he slept in the car; when he got home at about 8 a.m. he found his son alone in the apartment; he thought his wife might have gone to Miami with a man named Jamie Gonzales.

Defendant talked with Sergeant Mejia again on July 20th. At that time he filled out a formal missing persons report. He told Mejia the same story he had on July 9th. Mejia indicated that Miss Mora believed he had ''disposed of'' Magdalena. Defendant stated that Miss Mora would know more about his wife's whereabouts than he would, since she was staying with Miss Mora.

Defendant returned to the police station upon request on the morning of September 17. He talked with Sergeant Mejia. Later that day he was placed under arrest. That evening Sergeant Williams examined defendant's car which was parked in front of the station. He observed that the spare tire in the trunk was ''exceptionally clean for a spare tire in a trunk.'' Upon examining it closely he observed what looked like dried bloodstains in a small v-shaped area between the rim and the tire. Subsequent laboratory tests determined that the stains were human blood.

On September 23 a police criminalistics expert went to the Vermont Avenue apartment which had not been reoccupied since defendant moved out on July 31. He found that portions of the underside of a living room rug and the pad beneath it had been sprayed with an aluminum paint. There were dark brown stains where the paint was sprayed. Tests run on the stains revealed they were human bloodstains.

After the prosecution introduced the above evidence, the court held a hearing, outside the presence of the jury, and received evidence relating to the admissibility of confessions defendant made after his arrest. The hearing was a protracted one, taking up more than a week in time and accounting for more than 500 pages of reporter's transcript. The circumstances under which defendant's statements were made were thoroughly explored and are summarized below:

When Sergeant Mejia began his conversation with defendant on the morning of September 17, he explained to defendant that the investigation had reached the point where suspicion was focused on him. The officer stated that it was his duty to advise him of his constitutional rights.

He told defendant in Spanish, "the Constitution of the United States guaranteed him certain rights and they were a right to an attorney, a right to remain silent, a right to know that anything he would say would be used against him in subsequent court proceedings." The officer used the word "licenciado" to signify "attorney."

Sergeant Mejia asked whether defendant understood he had these rights. Defendant responded by asking the officer whether he was entitled to these rights in view of the fact he was an alien. Mejia told him that everybody in the United States has these rights. Defendant was then asked if he would be willing to submit to a polygraph or lie detector examination and he replied affirmatively.

Sergeant Burdick administered the polygraph examination. He regularly gave these tests. It began at 10:30 a.m. and concluded at 3 p.m. that afternoon, with a one hour break at noon for lunch. The officer was not in uniform at the time and a female interpreter was used to translate most of the communications between them. The examination was tape recorded. (The tape was played for the trial judge who indicated he had some knowledge of the Spanish language.) Prior to the test, the operation of the machine was thoroughly explained to defendant. Throughout the examination he was exhorted to tell the truth; he was told his story did not sound

true. However, persistent questioning failed to uncover any major inconsistencies or incriminating statements.

From defendant's physical reactions as measured by the polygraph apparatus, Burdick concluded that defendant was not telling the truth. He told Sergeant Mejia the results and the latter then talked to defendant. Mejia stated to defendant that if he had killed his wife, "he had a duty to himself, the community, and to God to tell us where the body was, in order that she could have a Christian burial." Defendant again denied that he had killed his wife.

Mejia then informed defendant he was leaving the station and would be gone over the weekend. He stated that if defendant wished to make a statement or to see him he should tell the jailer and he would be contacted; that if he wished to see a priest he could arrange it.

The same night, at defendant's request, his child was brought to the station and permitted to remain for a time with defendant.

On Sunday evening, at about 6 p.m. Sergeant Mejia came from his home to the station after receiving a message that defendant wished to see him. When he arrived defendant told him that he "wanted to tell all about it but first he wanted to talk to a priest." Defendant had been crying slightly and appeared remorseful. Shortly thereafter a priest from a local Catholic school arrived and had a private half-hour conversation with defendant. After the priest left defendant asked Mejia whether the priest had told him what he had said. Mejia replied that he had, but that he wanted to hear it from him. Defendant then confessed to Sergeant Mejia that he had killed his wife. The conversation was tape recorded. (The court listened to the tape.) Defendant then typed out a formal confession which he completed and signed at about 10 p.m. that night. He told Mejia "this is exactly what happened."

At no time had defendant been subjected to any force or threats, nor was he made any promises of any kind. When defendant turned over the confession to Mejia, he asked whether he would be represented in court by an attorney. Mejia said that he would have an attorney, that the public defender's office would represent him.

The confession, typed in Spanish, was translated by an interpreter and read to the court. Defendant stated in the confession that he had served in the Colombian Armed Forces for 15 years and had become chief of a communications and

intelligence section. After leaving military service in 1961, he acted as chief of communications for the national police. He related that he decided to resign from the police force and come to the United States because his wife was seeing other men and making his life unbearable. After he had been in the United States for a few months, he agreed to bring Magdalena and their child to this country, after she sent letters promising that she would behave. She did not keep her promise, however, and continued to be unfaithful, often leaving him alone to care for the child.

Defendant's statement then continued: "On Friday at 9:00 I returned to my house around 9:00 p.m., and Magdalena and the child were absent. I turned on the TV and I watched the programs. About ten and a half—10:30—she arrives and the child. She leaves the child on the bed we have in the living room, since she slept in the living room, and I slept in the back room. After laying down the child, she makes a telephone call.

"I remember that I told her, 'Magdalena, this is not right. This is not the time to come in and have the child stand in the cold in the street.'

"She answers me, 'Eat shit. I know what I do, and it's none of your business.' And she left again.

"I followed her, and I saw her entering the telephone booth there is in the gas station. About twenty minutes go by and a car arrives, which I can't identify because the night was very dark and I was far. A man got down from the car, and they hug and kisses. They entered the telephone booth, and they are there close to fifteen minutes.

"The man comes out and leaves. I run to the apartment. When she gets there, I tell her, 'Magdalena, today you couldn't bring in the lover because I'm here. Why don't you leave with one of them, and you leave me the child?' We started to argue.

"She tells me yes, and that—that she will leave soon; that she has a father for the child. I tell her to leave instantly, but that I will not let her take the child; that I'm going to send the child to a summer camp for two weeks, and that I'm going to take him away from her, because I don't want a prostitute mother for my son, of which he will have to be ashamed of later on.

"I cannot contain myself. She calls me, 'Son of a whore. I have never liked you. Don't bitch me any more. You leave. I can pay the apartment,'

"I show her a letter that I received from Bogota about the abortions, and she tells me, 'I did it because I felt like it. And don't bitch me any more, son of a whore.'

"I couldn't control myself any more. I got her; I gave her several blows, and I threw her to the floor. When falling on her back, she hit herself against the bed frame that we have in the living room, and this pierced her cerebrum.

"I was like crazy. I didn't know what to do. When I reacted a little, I tried to revive her. I poured water, alcohol; I tried to give her respiration, but she was dead.

"I ripped—wrapped her in a sheet. My son was sound asleep and didn't see anything. I don't know how this could happen, but it was in minutes.

"Once I was a little calmed, I looked at reality. I had to look at the future of my son.

"He is only four years. I have to hide the body. I covered it with a sheet and took it down to the car. I put her in the trunk. I take my son. I cover him good and, asleep as he is, I lay him on the seat of the car. I am in a state of nerves that I am not able to drive the car. I wait about an hour and it must have been 2:00 o'clock in the morning on Saturday, 10th. I ride around in the car and I can't resolve what to do. I am in the outskirts of Covina, Corona, and at sunrise 6:00 a.m. I return near the apartment. I park near the Boys Market.

"At 9:00 a.m. I buy milk and apples and I give to the child and I again leave in the car on the highway to San Diego. I am all day roaming around on the highway. I don't know what to do. I only think of my child, what will become of him if I am found out.

"Night comes and I am near a military camp. I park the car. I wait until my son goes to sleep and I put her in the ocean. I pass the night near there.

"On the dawn of Sunday I return to the apartment. I don't know what to do and I can't explain to myself what came over me to do this atrocity. I go with my son to Mass. I ask to see if they will receive my son in the school the Fathers have, but which is closed at that time because of vacations. I think that I must keep this quiet to protect my son because if I give myself up I think that my son will be unprotected. Who will feed him and clothe him? As a result I don't know what to do.

"I continue to work and I dedicate myself to take care of my small son, but each day that passes is a torment for me. I have to tell someone what happened. I can't hide this myself,

take any more. What shall I do? What is going to become of my son? I know I committed a crime and I must answer before God and before the law. This is my confession. I know I have a debt and I must pay it. I only ask that my past be studied, the very dirty behavior of this woman, the way in which she paid me.''

The day following defendant's confession, he directed the officers to an uninhabited coastline, which he said he thought was the place where he had thrown his wife's body into the ocean. Attempts to locate the body, however, proved unsuccessful.

On September 21, defendant agreed to take another polygraph examination to determine whether he was telling the truth about the way in which he killed his wife and about where he put the body. When told the test indicated he was not telling the truth, defendant insisted that he was not lying about the location where he had taken Magdalena's body. He changed his story about how he killed her, however, stating that during their argument he lost his head and grabbed an iron clock; he struck her on the head with it repeatedly until she was dead. The clock, he indicated, was at his new apartment.

Defendant consented to go with the officers to the apartment, which was located on South Lake Street, and to permit them to enter. There, he pointed out the clock to Sergeant Mejia. The latter examined the clock and told defendant that it was not made of iron and would have shattered had he struck his wife with it as he asserted. Defendant replied that he did hit her with it. He pointed out a bed frame and stated she had fallen backwards and hit her head on it. The same day defendant gave the officers the names of two persons in Colombia to whom he had written letters (People's Exs. 12 and 13) after his wife's death.

Defendant testified at the hearing on the admissibility of his confessions, his testimony being limited to this issue. Through a court interpreter, he testified that he was not advised of his constitutional rights in Spanish by Sergeant Majia; even if he was advised, he did not understand the word ''licenciado'' to signify ''lawyer''; In Colombia the word signifying attorney is ''abogado''; the word ''licenciado'' refers to ''anyone that has a license such as a nurse or electrician.''

Defendant testified that on the way to take the lie detector test, after talking with Mejia, he had asked the officer,

"Please, I want to see a counsellor. I want to see an attorney." According to defendant, Mejia replied, "Later you can see anything you want. But right now we are going to that machine. Afterwards."

Defendant further testified, that he was kept under restraint before he took the September 17 lie detector test and that when he took it, Sergeant Burdick frightened him by shouting, pointing his finger at him and sitting right up next to him; on Saturday and Sunday before he made the alleged confessions, the jailers two or three times had come in and said "Yes, you killed her"; when he asked how long he would be in that cell, one of the jailers told him "You can stay here for many years until you tell us that you killed her"; Sergeant Williams interrogated him on one occasion, telling him that if he confessed they would let him out of his cell, and that otherwise he would be incarcerated for a long time; although he was fed well during this period, he was unable to sleep; on Sunday he became hysterical; he was very concerned about the welfare of his child; he did not believe his wife was dead; he confessed that he killed her, because he feared if he did not confess he would spend much more time in jail and would lose his son, and because of the insistence by the police that he confess; he had written to his aunt telling her Magdalena had died in an accident because he did not want his family to know she had left him again; although he was a chief of communications and an instructor with the Colombian National Police, he never became familiar with police procedure regarding investigation of crimes.

The Consul General of Colombia, stationed in Los Angeles, testified for defendant. She stated that in Colombia the Spanish language word for attorney is "abogado." No other word is used to signify attorney. After she came to southern California, she heard the word "licenciado" used for "attorney." It is used here "quite a lot." In Colombia it merely means "one who has a license."

The court, at the request of the defense, examined and took judicial notice of the definitions of the word "lawyer" in three Spanish-English dictionaries. The dictionaries indicated that "abogado" was the most widely used word to signify "attorney"; that "licenciado" was also used in Mexican and Central American usage.

Sergeants Williams and Mejia, together with three officers in whose custody defendant was placed on the weekend of September 17-19 and the female interpreter who was used

when defendant was given the September 17 polygraph examination, testified in rebuttal. According to their testimony, no one used any threats, promises or coercion on defendant; his confessions were completely voluntary.

The interpreter related that defendant was seated across a desk from Sergeant Burdick at all times during the polygraph examination; Burdick did not shake his finger at defendant or put his face up next to defendant's face. The jailers testified they did not tell defendant ''you killed her'' or words to that effect; they did not tell him he would have to remain in his cell until he confessed; defendant did not ask to see an attorney.

Williams testified he did not tell defendant that if he confessed he could get him out of his cell; he did speak with defendant on Saturday, September 18th; defendant at the time appeared to have been crying slightly; he did not interrogate defendant; when he asked him what was the matter, defendant gave no response; upon being asked if he wanted to contact Sergeant Majia, defendant gave a negative response; the next day defendant appeared remorseful; he summoned Mejia that evening at defendant's request.

Mejia testified, denying that defendant ever requested to see an attorney. He further testified that he made no promises to defendant regarding his son; he did not say defendant would lose his son unless he confessed; defendant had asked him what the punishment would be for someone who killed his wife, and he told defendant that if it was a crime of passion the person would normally go to prison.

Following the ruling of the court that the confessions were voluntarily made and in compliance with the rules respecting the warning of constitutional rights, the proceedings were resumed in the presence of the jury.

Sergeant Mejia testified as to the events leading up to and following defendant's confessions but omitted all references to the polygraph examinations. Defendant's written confession was then translated and read to the jury.

Defendant testified that he did not kill his wife; his confessions were false; they were made in order to help his son, and because he was led to believe he would spend a shorter time in jail if he confessed; he never threatened his wife; as he first told Mejia, his wife was gone when he came home on the morning of July 10th; he filled out the change of address card because he believed he could evade his legal responsibility for Magdalena by proving she no longer resided with him; he

sprayed the rug of his apartment with paint to cover up bloodstains made when he injured himself decorating a Christmas tree; he thoroughly cleaned his automobile every weekend; in the letter dated July 8, 1965, he had not said he was "involved in something of a homicide"; this was a mistranslation; he had not used the Spanish word "homicidio" meaning homicide but had meant that a person named "Homi" had "given in" ("cidio" purportedly being the third person past tense of "to give in."); regarding the other letter, he informed his aunt that Magdalena had died in an auto accident because he was embarrassed to admit she had left him again.

As he had at the hearing regarding the admissibility of his confessions, defendant testified that pressure was used by the police to get him to confess. He related that he was not advised of his constitutional rights; that he did not understand the word "licenciado" to mean "attorney." In this respect, the defense introduced the testimony of the Colombian Consul General and of a superior court interpreter from Cuba. Both indicated that before they came to southern California, they had never heard the word "licenciado" used to mean "attorney."

During defendant's testimony it was elicited, that from the time he was first questioned, he knew that he had a right to an attorney; he asked for an attorney and the police refused to get him one. In response to questioning by the court on the latter point, defendant testified, that on the morning of September 17 when he talked with Sergeant Mejia, he was aware that he had a right to have an attorney.

At the request of the defense, the tape of the interrogation of September 17 was played for the jury.[2]

In rebuttal, the officers who had testified at the hearing on the admissibility of the confessions, again testified, denying that defendant was pressured in any way to confess or that any promises were made to him. In addition, the jury heard the testimony of Officer Rowley. He related that he was a jailer on the night watch over the weekend of September 17-19. On one occason, he carried on a conversation with defendant. He could not speak Spanish and the conversation was in

---

[2]In the tape, which was played in its entirety, references were made to the polygraph examination. The court instructed the jury in its formal instructions, that this evidence was introduced at defendant's request, and could be considered only on the question of the total effect the questioning had on defendant's mental freedom in making his later statements.

English. Defendant could speak "fair English." Defendant told him he was an army officer from Colombia. He asked defendant if he wanted anything, and in particular asked defendant if he wanted an attorney, to which defendant replied, "No."

Another policeman, Officer Mockett, had occasion to carry on a conversation with defendant in English. On September 17, on the way from the 77th Street police station to the Police Administration Building, he talked with defendant in English for about 10 minutes. Defendant had no trouble expressing himself. Among other subjects, defendant talked about his former position with the Colombia National Police and about the cost of living in that country.

Evidence was introduced by the prosecution that the past tense of the verb "to give in" is "cedio" and not "cidio" as defendant asserted in attempting to explain the letter containing the word "homicidio."

As indicated above in the statement of the facts, in addition to the independent findings of the trial court that defendant's confessions were voluntarily given and that his rights to counsel and silence were not violated, the jury heard the evidence on both issues. The court instructed the jury that it could not consider the confessions unless it made an independent determination that they were voluntarily made.[3] Also given was an instruction that the jury could not consider the confessions unless it found defendant was effectively warned, in language understood by him, of his rights to silence and to be represented by counsel, and that he knowingly and intelligently waived these rights.[4]

Defendant contends that, as a matter of law, the evidence establishes he was intimidated and the victim of "psychological warfare" which broke down his free will and caused him to confess. In particular he points to the polygraph examination of September 17th, and asserts that the officer who conducted it badgered him and "planted the seeds to confess" in his mind. Defendant suggests that the officer's actions were at least partially responsible for the subsequent confession. Also, a contributing factor he asserts, was Sergeant Mejia's action in telling him just before he confessed, that the priest who had talked with him had revealed what had been said in their meeting; that while there is

[3]CALJIC 29-A (Re-revised) was given.
[4]A slightly modified version of CALJIC (29-B (new)) was given.

nothing to indicate the priest actually revealed any privileged communication, he believed otherwise.

The evidence presented on the question of voluntariness was extensive and conflicting. The trial court rejected defendant's version of what occurred. Characterizing the interrogation during the polygraph examination as "persistent," the court specifically found that it was not "coercive." It further noted that no causal connection was shown between the questioning and the confession which was made two days later.

■ Where the evidence shows that before he confessed the defendant took a lie detector test, if it was taken willingly, neither the fact it was given nor the fact that the defendant was told by the test giver it revealed in his opinion that defendant was not telling the truth, inherently demonstrates coercion. (*People* v. *Eli*, 66 Cal.2d 63, 74 [56 Cal.Rptr. 916, 424 P.2d 356].) ■ Further, advice or exhortation to a defendant to "tell the truth" or that "it would be better to tell the truth" does not constitue coercion, so long as such advice or exhortation is not accompanied by threats or promises. (*People* v. *Hill*, 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) ■ "In the absence of a clear abuse of discretion, the trial court's conclusion as to the voluntary nature of the confession will not be disturbed on appeal. [Citations.]" (*People* v. *Sanchez*, 65 Cal.2d 814, 826 [56 Cal.Rptr. 648, 423 P.2d 800].)

■ Officers Mejia and Williams testified that defendant freely consented to take the polygraph examination. Both testified that on the Sunday evening before he confessed, defendant appeared to be in a state of remorse. The testimony of the officers who had custody of defendant over that weekend, tended to substantiate this observation. All the officers who were involved with defendant during this period denied there was any coercion or the making of any promises. When defendant sent for Mejia on Sunday evening, he told him he "wanted to tell him all about it" after first seeing a priest. It could reasonably be concluded that defendant was then and there prepared to confess and that Mejia's telling him, in response to defendant's inquiry, that the priest had told him all about it, had no effect in inducing the confession. The trial court listened to the tape of the polygraph examination, the tape of the subsequent oral confession to Mejia, and was read defendant's formal confession. Ample evidence was presented to support the trial court's finding on this issue.

■ Defendant also maintains that the trial court erred

in concluding that he was effectively advised of and knowingly waived his constitutional rights as required under the mandate of *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].[5] Our attention is directed to defendant's testimony that he did not understand the officer's admonition in Spanish that he was entitled to an attorney, because ''licenciado'' was used to signify attorney rather than ''abogado,'' the word the evidence shows was commonly used in defendant's home country. It is contended by defendant that this conclusively establishes he was not properly advised of his rights.

■ ''An accused's rights to counsel and to remain silent may be waived if he knows of his rights and intelligently and knowingly elects to waive them. [Citations.]'' (*People* v. *Sanchez, supra,* 65 Cal.2d 814, 825.)

■ Defendant testified during the hearing on the admissibility of the confessions that he asked Sergeant Mejia for an attorney before he was taken for the first lie detector test. According to defendant, Mejia had replied he would first have to take the test. Majia testified he advised defendant of his rights (using the word ''licenciado'' to signify attorney) just prior to securing defendant's consent to take the test; that defendant never requested an attorney. The trial court was entitled to believe the officer and to disbelieve defendant. But, from defendant's testimony that he had asked for an attorney, the court could reasonably infer that defendant heard and understood the officer's admonition. Also indicating his awareness, was the evidence that, immediately after his rights were explained, defendant inquired whether as an alien he was entitled to these rights. It stretches credulity to suppose that defendant, a former police officer and instructor in his home country, could have understood Sergeant Mejia was advising him he was entitled to a ''person with a license such as a nurse or electrician,'' as defendant suggests without his having inquired as to what Mejia was talking about or asking for a further explanation.

■ That the court correctly found defendant was aware of his rights, was admitted by defendant. He acknowledged in his testimony when the issue was subsequently presented to

---

[5]As the trial in this case took place prior to the date of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the standards required by that case are not controlling here. (*People* v. *Rollins*, 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

the jury, that he knew at the time he was first questioned by Mejia that he was entitled to an attorney.

Defendant maintains that evidence secured when his automobile and apartment were searched should have been excluded because the searches were illegal.

Defendant refers to the search of his vehicle by the police on the evening of September 17, 1965. He had left the automobile parked in front of the 77th Street police station that morning. There he had been questioned by Sergeant Mejia. He was then taken for a lie detector test at police headquarters. He was arrested that afternoon. The evidence obtained from the car included photographs of the trunk area and the finding of the bloodstain on the rim of the spare tire.

Regarding the search of his apartment, defendant alludes to the search made by Mejia on September 21, 1965. After defendant had made his confessions, Mejia and defendant visited defendant's new Lake Street apartment and defendant pointed out the clock he assertedly had used to bludgeon his wife.

■ Defendant did not object at the trial to the introduction of the evidence secured in these searches. Under well established rules, except under special circumstances, questions respecting the admissibility of evidence will not be reviewed on appeal absent sufficient objections in the trial court. (*People* v. *Garrison,* 246 Cal.App.2d 343, 350 [54 Cal. Rptr. 731].)

■ The facts indicate no basis for an objection to the search of the Lake Street apartment on September 21st. The evidence demonstrates that defendant willingly consented to the officers' entry and search. Whether there was a basis for objecting to the search of the automobile, presents a more difficult problem. ■ We do not agree with the assertion of the Attorney General that the search was shown to be incidental to defendant's arrest. He was arrested in the police station, not in the car, and the search of the car followed the arrest by several hours. (See *People* v. *Webb,* 66 Cal.2d 107 [56 Cal.Rptr. 902, 424 P.2d 342]; *People* v. *Burke,* 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67].) ■ But the search could have been supported by evidence that defendant freely consented to it or that the police had in fact secured a search warrant. The record is completely silent in both respects. At the time the evidence was offered, the court inquired whether defense counsel wished to make any objection. Counsel, an experienced deputy public defender, made no objection.

Under the circumstances presented, we cannot assume the prosecution could not have introduced evidence supporting the search had they been called on to do so. (See *People* v. *Burke, supra,* 61 Cal.2d 575, 578.) ██ Rather, we must assume that defense counsel's decision not to object, and thereby, possibly require the prosecution to go forward with additional evidence, was simply a matter of trial tactics. "Ordinarily the tactical decisions of trial counsel will not be reviewed with the hindsight of an appellate court. [Citations.]" (*People* v. *Garrison, supra,* 246 Cal.App.2d 343, 350-351.) As in *Garrison*, in this case there may be "considerations not shown by the record" for counsel's decision.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 24, 1968.