Filed 4/10/13  P. v. Calderon CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL CALDERON,<br><br>    Defendant and Appellant. | H037488<br>(Santa Clara County<br>Super. Ct. No. E1007534) |

A jury convicted defendant Michael Calderon of rape, forcible sexual penetration, forcible oral copulation, and dissuading a witness.  The trial court sentenced defendant to 11 years in prison.  On appeal, defendant contends that he received ineffective assistance of counsel because his counsel failed to move to strike prejudicial testimony by the victim as inadmissible hearsay, as character evidence, and as more prejudicial than probative.  We disagree and affirm the judgment.

BACKGROUND

Defendant and the victim began dating in 2007.  By January 2010, the victim was spending a couple of nights a week at defendant's apartment, which he shared with his mother and sister.

On New Year's Eve 2009, the victim became sick from drinking too much alcohol and fell asleep in defendant's room.  She was awoken by defendant yelling at her and hitting her across the face, upset that she had ruined his night by not having sex with him.  She then felt forced to have sex with defendant.

On January 20, 2010, defendant and the victim went to San Francisco for the day. After returning, the victim informed defendant that she wanted to break up. Defendant became angry and pinned her to the bed, refusing to let her leave. He then terrified her by threatening to kill her with an extension cord. The victim agreed to stay the night and had sex with defendant.

The next morning, the victim used defendant's phone to call a friend and found flirtatious text messages from defendant to other women. When she questioned defendant about the text messages, defendant became angry and pinned her down, punching her in the back as she tried to get off the bed. The two then fought. Defendant pulled at the victim and scratched her eye; the victim elbowed defendant. Defendant then became distraught. He hit himself in the chest and declared that the victim was the love of his life and that she could not leave him. Defendant then terrified the victim by choking her and suffocating her with a pillow. He thereafter started kissing and touching her aggressively. The victim cried and pleaded for defendant to stop. Defendant nevertheless orally copulated the victim, penetrated her with his finger, and inserted his penis into her vagina.

The victim stayed at defendant's apartment that morning and continued to argue with defendant. She would repeatedly leave for her car and then return to the apartment. At one point, defendant's mother came outside to check on her sitting in the car. The victim confessed that defendant had hit her, and the mother advised her to call the police. The victim refused because she was afraid. She then returned to the apartment. In the apartment, she informed defendant's sister that defendant had hit her, and the sister called the police. Defendant had left the apartment by the time the police arrived.

The victim was taken to the hospital where a nurse conducted a sexual assault response team examination. The nurse found bruising on the victim's right cheek, right breast, and right forearm. She saw abrasions on her left forehand, an abrasion under her left eye, a laceration over and inside her left eye, an abrasion on the left side of the labia

2

minora, and swelling of the clitoral hood. The injuries were consistent with forcible sexual assault.

After the incident, defendant sent the victim numerous e-mails, text messages, and social media messages stating that he was heartbroken and in fear for his life. But he threatened the victim in an attempt to persuade her to drop the charges. And in February 2010, he accosted her at her work and told her to save him from going to jail. The victim escaped and called the police.

On February 17, 2010, at the request of a detective, the victim made a recorded pretext phone call to defendant and agreed to meet him at a McDonald's. The police arrested defendant when he arrived. While in jail, defendant made three recorded telephone calls to the victim. During the first phone call, defendant threatened her, stating that her street "is about to see some heat; I got niggas on the block, in the town, all over there." During the second phone call, defendant said that he made the threat in anger, but also stated that she was "a snitch, and, and word is gonna get out on the streets, you know what I'm saying?" In the third phone call, defendant apologized, stating that everything was his fault.

INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that defense counsel's failure to move to strike some of the victim's testimony on the grounds of hearsay,[1] character evidence,[2] and more prejudicial than probative[3] deprived him of effective assistance of counsel.

---

[1] Evidence Code section 1200 (hearsay is an out of court statement admitted for the truth of the matter asserted and is inadmissible unless it falls under a specified exception).

[2] Evidence Code section 1101 (character evidence in the form of specific instances of a person's conduct is inadmissible when offered to prove the person's conduct on a specific occasion).

[3] Evidence Code section 352 (exclusion of evidence if probative value is substantially outweighed by probability that admission will necessitate undue (continued)

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) That right "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*Ibid.*) But the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8.)

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-696.) 'When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of representation provided by counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' [citation], the contention must be rejected." ' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.)

Defendant bears a burden that is difficult to carry on direct appeal. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Our review is highly deferential; we must make every effort to avoid the distorting effects of hindsight and to evaluate the challenged conduct from counsel's perspective at the time. (*In re Jones* (1996) 13 Cal.4th 552, 561;

_____

consumption of time or create substantial danger of undue prejudice, confusion of issues, or misleading the jury).

*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)  In evaluating whether trial counsel's representation was deficient "we accord great deference to the tactical decisions of trial counsel in order to avoid 'second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel "to defend himself [or herself] against a claim of ineffective assistance after trial rather than to defend his [or her] client against criminal charges at trial." ' " (*In re Fields* (1990) 51 Cal.3d 1063, 1069.)  A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance.  (*Strickland v. Washington*, *supra*, at p. 689; *People v. Hart* (1999) 20 Cal.4th 546.)  The burden is to establish the claim not as a matter of speculation but as a matter of demonstrable reality.  (*People v. Garrison* (1966) 246 Cal.App.2d 343, 356.)  As to failure to object in particular, "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)  This is the case especially when trial counsel might reasonably have concluded that an objection would be futile.  (*People v. Price* (1991) 1 Cal.4th 324, 387.)

We emphasize that the issues in this case do not concern the admissibility of evidence.  They concern whether defense counsel had reason to refrain from objecting to the admission of evidence.

Defendant essentially complains about four asserted derelictions.

The first instance is defense counsel's failure to move to strike the victim's volunteered statements about defendant's violence against members of his family and other women.  The victim testified to the following when asked on direct examination about whether she had a conversation with the (1) mother about calling the police, and (2) sister afterward:

"I couldn't do it.  She kept handing me the phone and she's like, . . . you need to-- you need to do something, like, 'cause she saw the bruises on my face, and she's like-- she saw me--she had seen me once in--in the house, but the house was very dark so you

5

couldn't see anything. And in the car it's bright lighting, right, so she--she saw my bruises, and she's, like, did he do that to you, and I said yes, and I kept crying.

"And she's, like, that's it. I've had enough of him. He's out of control. He's doing this to me, he's doing this to you, who knows what he can do now. And she told me to call the cops, and I said I can't. I--I couldn't. I--I just couldn't. I don't know why, but I couldn't. And she's like--and I told her to call and she's, like, we just need to take a deep breath. She's, like, I don't know how to speak English that well, and she's like just calm down, relax, let's go inside the house and talk it out."

"Yes. I told her what had happened, and because the mom walked me in, she is, like, look what [defendant] has done again. And then I told [her], like, she told me did he hit you again and I said yes, he did. And this time's, like, he [*sic*] really like out of control, right, and then she told me I tried everything to save him, but he's not listening to us. He's not doing--he's hurting us. Right. He is hurting his family. He is hurting you. He is out of control. And she told me that's it. That's it.

"And he was in his room locked in. I think he was on the computer or listening to music. So she's, like, that's it. I'm taking my baby next door because that's the safest area right now for him. So she goes across the apartment complex, drops off her baby, and then after that she is banging on his door telling him to, like, come out, and then she just yelled at him saying that, like, how could you do this, I'm going to call the cops on you and all these things. And then after that she--she kept telling him--and her husband was there also because we're kind of afraid of what he could do, right? [¶] . . . [¶] I--I told her that--she's, like, did--she asked me I know he hit you. He's like that. And she's, like, did he force you to have sex because he--he forces other girlfriends to have sex, right, at one point when they had issues, and she's, like, did he force you to have sex and I said, yes, and I just broke down crying. I don't think I gave her any specifics. I really can't remember."

According to defendant, the statements of the mother and sister were objectionable hearsay and character evidence and were more prejudicial than probative. He urges that the evidence gave the jury a general picture of defendant as a violent sexual predator who had committed repeated acts of domestic violence against his family.

But counsel might very well have reasoned that the statements were not hearsay because they pertained to the nonhearsay purpose of explaining why the victim could not call the police. And he could have similarly reasoned that the character evidence was pertinent to intent given that he relied on self-defense for one of the counts. (Evid. Code, § 1101, subd. (b) [prohibition on admission of character evidence does not apply if the evidence is relevant to prove some fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident other than the person's disposition to commit the act].) As such, he also could have reasoned that the probative value of the evidence was not substantively outweighed by the danger of undue prejudice. Stated another way, defense counsel could have reasonably concluded that a motion to strike would have been futile and would only serve to emphasize the perceived negative inferences from the statements.

On this same theme about violence, defendant also complains about the victim's testimony elicited on cross-examination that "His mom told me. He even told me that he hit his mom. He hits his mom. His mom is--my God, his mom does everything for him. Everything. Everything, sir. And he hits his mom--[¶] . . . [¶] . . . his sister told me once, and that's why she disapproves of him because he beats women."

But defense counsel could have elected to continue his cross-examination so as to diffuse the negative inferences of the testimony rather than move to strike and possibly emphasize the negative inferences of the testimony.

The second instance is defense counsel's failure to move to strike the victim's volunteered statements about her father. The victim testified during direct examination to

7

the following when asked about her phone conversation with defendant while defendant was in jail.

"A.    He was asking me that--he's stating that my parents said that I was going to drop the charges, no charges were going to be made, that--my parents went to talk to [defendant's] mom because my dad was worried, he doesn't want to see me on Channel 5 news saying that--the reporter saying I'm dead or something, so my--

"Q.    Let me stop you.  You seem to be going off to what your dad was thinking."

According to defendant, the statements of the father were objectionable hearsay and character evidence and were more prejudicial than probative.  He urges that the comment about television news suggested that he had a propensity toward violence.

But the comment was a brief, hyperbolic reference that the prosecutor cut off in midstream.  Again, defense counsel could have reasonably concluded that a motion to strike would have only served to emphasize or actually create the perceived negative inference.

The third instance is defense counsel's failure to move to strike the victim's statements elicited on cross-examination about defendant's use of marijuana.  The victim testified to the following when asked about her trip with defendant to San Francisco.

"A.    The police stopped us because of [defendant], because of my car, my car was searched because he had problems with the police and--my car was searched, and at that point I--I felt like I had a criminal record when I never did, and I told him that I didn't approve of that lifestyle.

"Q.    What lifestyle are you referring to?

"A.    That lifestyle of us going somewhere, and at that point, my car had a taillight, my license plate was out, and I got stopped because of that, and because he has a bad record, my car gets searched, and he likes to smoke weed, and you can just imagine,

8

like, the anxiety of that because I can--I can also get in trouble. . . . I don't want nothing to do with the law and--

"Q. I understand.

"A. That's why things are unpleasant because his lifestyle is a lot of alcohol, it's a lot of drugs and stuff. I don't know exactly what he did, but I know he smoked a lot of weed, and I don't want--I don't--it was at a point where I--I was thinking to myself I don't--I don't want that."

According to defendant, the statements about marijuana were objectionable character evidence and were more prejudicial than probative. He urges that evidence of an unpleasant lifestyle involving drug use is highly prejudicial.

But, again, defense counsel may have decided against moving to strike because he elicited the unfocused and nonresponsive statements and an objection would only serve to clarify or emphasize defendant's use of drugs. In any event, defendant embraced his lifestyle involving drugs. He proudly testified: "I was a pothead. I didn't have no shame in smoking weed, and all my friends smoke weed. It was part of our whole music community. It was like a ritual almost." Thus, assuming that defense counsel was ineffective by failing to seek exclusion of the victim's marijuana testimony, defendant fails to demonstrate that counsel's deficient performance subjected him to prejudice.

The fourth instance is defense counsel's failure to move to strike the victim's statements elicited on cross-examination about her undergoing domestic violence counseling. The victim testified, without objection, that she learned through counseling that "when you're in a domestic violence relationship, a woman doesn't know what she's going through. . . . [¶] . . . [¶] Yes. I was taught that." She added that "they gave me paperwork through the sexual assault counselors. They were the first ones that day that gave me paper that described why this happens."

According to defendant, the victim's "references to information in domestic violence pamphlets, and the 'diagnosis' of rape" were hearsay and "inadmissible opinion

9

evidence." But defendant makes no argument that counsel's supposed dereliction was prejudicial. The victim's testimony regarding domestic violence counseling was unfocused and brief. Its relevance to defendant's culpability is nuanced, at best. We cannot imagine why a successful motion to strike the testimony would have resulted in a more favorable verdict.

Again, the failure to object rarely establishes ineffectiveness of counsel. Our review is highly deferential, and we presume that counsel's acts were within the wide range of reasonable professional assistance. Defendant has simply failed to demonstrate ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.


Premo, J.


WE CONCUR:



Rushing, P.J.



Elia, J.

10